# EXHIBIT "A"

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Tesla, Inc., a Delaware corporation, and DOES 1 through 100, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:** Caleb Mendoza; Eduardo Mendoza and
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* Maria Mendoza; and Estate of Genesis
Giovanni Mendoza Martinez, by and through its personal representatives, Eduardo and Maria Elena Mendoza,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* Superior Court of California, County of Contra Costa, Wakefield Taylor Courthouse, 725 Court Street, Martinez, CA 94553 | CASE NUMBER: *(Número del Caso):* C24-02690 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brett J. Schreiber, Esq., Singleton Schreiber, LLP, 591 Camino de la Reina, Ste. 1025, San Diego, CA 92108; (619) 771-3473

| DATE: *(Fecha)* | 10/9/2024 4:25 PM | Clerk, by *(Secretario)* | /s/ C. Jacala | , Deputy *(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: 7 5 ᴎ Irc

    under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
    ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
    ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
    ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 www.courts.ca.gov |
|---|---|---|

## Superior Court of California, County of Contra Costa

# NOTICE TO DEFENDANTS
### In Unlimited Jurisdiction Civil Actions

**YOU ARE BEING SUED.** The packet you have been served should contain:

    a.    The Summons

    b.    The Complaint

    c.    The Notice of Case Management (shows hearing date and time)

    d.    Blank: Case Management Statement (Judicial Council Form CM-110)

    e.    Blank: Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days (Local Court Form CV-655b)

    f.    Alternative Dispute Resolution (ADR) Information  (Local Court Form CV-655c-INFO)

---

 # WHAT DO I DO NOW? 

### You must:

1. **Prepare your response**   YOU COULD LOSE YOUR CASE—even before it is heard by a judge or before you can defend yourself, if you do not prepare and file a response on time. See the other side of this page for types of responses you can prepare.

2. **Complete the *Case Management  Statement*  *(CM-110)***

3. **File and serve your court papers on time**   Once your court forms are complete, you must file 1 original and 2 copies of the forms at court. An adult who is NOT involved in your case must serve one set of forms on the Plaintiff. If you were served in person you must file your response in 30 days. If the server left a copy of the papers with an adult living at your home or an adult in charge at your work or you received a copy by mail you must file your response in 40 days.

4. **Prove you served your court papers on time**   by having your server complete a *Proof of Service, (Judicial Council form POS-040)*, that must be filed at the court within 60 days.

5. **Go to court** on the date and time given in the *Notice of Case Management Conference*.

6. **Consider trying to settle your case before trial**   If you and the other party to the case can agree to use mediation, arbitration or neutral case evaluation, the *Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days* can be filed with your other papers.  For more information read the enclosed ADR information, visit www.cc-courts.org/adr, or email adrweb@contracosta.courts.ca.gov.

**IMPORTANT! The court recommends consulting an attorney for all or part of your case.  While you may represent yourself, lawsuits can be complicated, and the court cannot give you legal advice.**

---

**COURT FEES:** You must pay court fees the first time you file your papers.  If you also file a motion, you must pay another fee.  If you cannot afford the fees, you may ask the court to waive (allow you not to pay) fees. Use Judicial Council forms FW-001-INFO [information sheet]; FW-001 [application]; and FW-003 [order].

**COURT FORMS:** Buy forms at the Law Library (1020 Ward Street, Martinez, CA) or download them for free at: www.courtinfo.ca.gov/forms/

## WHAT KIND OF RESPONSES CAN I FILE?

1. If you disagree with some or all of what the plaintiff says in the complaint because you believe, or know it is not true, you can file an <u>ANSWER</u>.

2. If you have a claim in the same case against the plaintiff, you may file a <u>CROSS-COMPLAINT</u>.

3. If you want to ask the court to do something on your behalf, you may file a <u>MOTION</u> *(See TYPES OF MOTIONS below)*

## HOW DO I PREPARE AN ANSWER?

There are two kinds of Answers you can use, depending on whether the Complaint was verified. You can tell if a Complaint is verified because it says "Verified Complaint" and/or has a signed oath on the last page.

**For complaints that are NOT verified:**

    Use Judicial Council form PLD-050 – General Denial

**For complaints that ARE verified:**

    a. For personal injury, property damage, and wrongful death claims, use Judicial Council PLD-PI-003 (do <u>not</u> check number 2).

    b. For contract claims, use Judicial Council PLD-C-010 (do <u>not</u> check number 3a).

    c. Be sure to deny <u>every</u> claim with which you disagree. For example, you might write: *"I believe, or know, that the information in paragraph #__ is untrue/incorrect."* Continue your list until you have addressed each paragraph in the Complaint.

**NOTE:** The Judicial Council Answer forms have spaces for your affirmative defenses. Be sure to include them or you may not be able to use them later. To find out what your affirmative defenses might be, go to the law library and ask the librarian to help you find the information you need.

**If you want to file a Cross-Complaint, you must do so at the same time you file the Answer.**

    a. For a personal injury, property damage, and/or wrongful death Cross-Complaint, use Judicial Council form PLD-PI-002.

    b. For a contract Cross-Complaint, use Judicial Council PLD-C-001.

## TYPES OF MOTIONS

Written motions are documents that ask the court to do something. You may have to file an *Answer* at the same time. At this point in the case, you can only make Motions from the following list:

1. <u>Demurrer</u> *(the facts stated in the complaint are wrong, or the deadline to file the lawsuit has passed)*;

2. <u>Motion to Strike</u> *(the complaint is unclear; does not follow the law, "doesn't matter", etc.)*;

3. <u>Motion to Transfer</u> *(the complaint is in the wrong court or there's a more appropriate court)*;

4. <u>Motion to Quash Service of Summons</u> *(you were not legally served)*;

5. <u>Motion to Stay</u> *(put the case on hold)*; or

6. <u>Motion to Dismiss</u> *(stops the case)*.

**NOTE: Motions are very complicated and you may want to hire a lawyer to help you.**

## WHERE CAN I GET MORE HELP?

- **Lawyer Referral Service**:   (925) 825-5700
- **Bay Area Legal Aid:**   (800) 551-5554
- **Contra Costa County Law Library**       Martinez:  (925) 646- 2783       Richmond:  (510) 374-3019
- **Ask the Law Librarian:**    www.247ref.org/portal/access_law3.cfm

## Superior Court of California, Contra Costa County

CV - Martinez-Wakefield Taylor Courthouse
725 Court Street
Martinez CA 94553
925-608-1000
www.cc-courts.org



K. Bieker
Court Executive Officer

NOTICE OF HEARING HAS BEEN PRINTED FOR THE FOLLOWING ATTORNEYS/FIRMS OR PARTIES FOR CASE NUMBER: C24-02690 ON 10/14/2024:

BRETT SCHREIBER
591 CAMINO DE LA REINA
STE 1025
SAN DIEGO CA  92108

### Superior Court of California, Contra Costa County

CV - Martinez-Wakefield Taylor Courthouse
725 Court Street
Martinez CA 94553
925-608-1000
www.cc-courts.org



K. Bieker
Court Executive Officer

| CASE NAME: | CASE NUMBER: |
|---|---|
| CALEB MENDOZA VS. TESLA, INC., A DELAWARE CORPORATION | C24-02690 |

1. NOTICE IS HEREBY GIVEN THAT A CASE MANAGEMENT CONFERENCE IS SET IN THE ABOVE ENTITLED CASE AND WILL BE HELD IN THIS COURT ON:

| HEARING DATE: | HEARING TIME: | HEARING LOCATION: |
|---|---|---|
| 02/07/2025 | 8:30 AM | DEPARTMENT 12 |
| | | 725 COURT STREET  ROOM 301  MARTINEZ, CA 94553 |

THIS FORM, A COPY OF THE NOTICE TO DEFENDANTS, THE ADR INFORMATION SHEET, A BLANK CASE MANAGEMENT STATEMENT, AND A BLANK ADR CASE MANAGEMENT STIPULATION AND ORDER FORM ARE TO BE SERVED ON OPPOSING PARTIES. ALL PARTIES SERVED WITH SUMMONS AND COMPLAINT/CROSS-COMPLAINT OR THEIR ATTORNEY OF RECORD MUST APPEAR.

2. YOU MAY STIPULATE TO AN EARLIER CASE MANAGEMENT CONFERENCE. IF ALL PARTIES AGREE TO AN EARLY CASE MANAGEMENT CONFERENCE, PLEASE CONTACT THE COURT CLERK'S OFFICE AT (925)608-1000 FOR UNLIMITED CIVIL AND LIMITED CIVIL CASES FOR ASSIGNMENT OF AN EARLIER DATE.

3. YOU MUST BE FAMILIAR WITH THE CASE AND BE FULLY PREPARED TO PARTICIPATE EFFECTIVELY IN THE CASE MANAGEMENT CONFERENCE AND TO DISCUSS THE SUITABILITY OF THIS CASE FOR THE EASE PROGRAM, PRIVATE MEDIATION, BINDING OR NON-BINDING ARBITRATION, AND/OR USE OF A SPECIAL MASTER.

4. AT ANY CASE MANAGEMENT CONFERENCE THE COURT MAY MAKE PRETRIAL ORDERS INCLUDING THE FOLLOWING:
   a) AN ORDER ESTABLISHING A DISCOVERY SCHEDULE
   b) AN ORDER REFERRING THE CASE TO ARBITRATION
   c) AN ORDER TRANSFERRING THE CASE TO LIMITED JURISDICTION
   d) AN ORDER DISMISSING FICTITIOUS DEFENDANTS
   e) AN ORDER SCHEDULING EXCHANGE OF EXPERT WITNESS INFORMATION
   f) AN ORDER SETTING SUBSEQUENT CONFERENCE AND THE TRIAL DATE
   g) AN ORDER CONSOLIDATING CASES
   h) AN ORDER SEVERING TRIAL OF CROSS-COMPLAINTS OR BIFURCATING ISSUES
   i) AN ORDER DETERMINING WHEN DEMURRERS AND MOTIONS WILL BE FILED

### SANCTIONS

IF YOU DO NOT FILE THE CASE MANAGEMENT STATEMENT OR ATTEND THE CASE MANAGEMENT CONFERENCE OR PARTICIPATE EFFECTIVELY IN THE CONFERENCE, THE COURT MAY IMPOSE SANCTIONS (INCLUDING DISMISSAL OF THE CASE AND PAYMENT OF MONEY).

### SUPERIOR COURT OF CALIFORNIA, CONTRA COSTA COUNTY

I DECLARE UNDER PENALTY OF PERJURY THAT I AM NOT A PARTY TO THE WITHIN ACTION OR PROCEEDING; THAT ON THE DATE BELOW INDICATED, I SERVED A COPY OF THE FOREGOING NOTICE BY DEPOSITING SAID COPY ENCLOSED IN A SEALED ENVELOPE WITH POSTAGE THEREON FULLY PREPAID IN THE UNITED STATES MAIL AT MARTINEZ, CALIFORNIA AS INDICATED ABOVE.

DATE:  10/14/2024                          BY:

C. JACALA, DEPUTY CLERK

1  Brett J. Schreiber, Esq. (SBN 239707)
   Srinivas Hanumadass, Esq. (SBN 228547)
2  Carmela Birnbaum, Esq. (SBN 190495) **Per local Rule, This case is assigned to**
   Singleton Schreiber, LLP
3  591 Camino de la Reina, Ste. 1025 **Judge Treat, Charles S, for all purposes.**
   San Diego, California 92108
4  Tel: (619) 771-3473 Fax: (619) 255-1515
   bschreiber@singletonschreiber.com      **SUMMONS ISSUED**
5  vas@singletonschreiber.com
   cbirnbaum@singletonschreiber.com
6

7  Attorneys for Plaintiffs Caleb Mendoza, Eduardo Mendoza and Maria Mendoza,
   and Estate of Genesis Giovanni Mendoza Martinez, by and through its personal
8  representatives Eduardo and Maria Elena Mendoza

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                    **COUNTY OF CONTRA COSTA**

11 **Caleb Mendoza; Eduardo Mendoza and**     Case No.:    C24-02690
   **Maria Mendoza; and Estate of Genesis**
12 **Giovanni Mendoza Martinez,** by and       **Complaint for Damages**
   through its personal representatives,
13 **Eduardo and Maria Elena Mendoza,**
                                               1. **Strict Products Liability**
14             Plaintiffs,                     2. **Negligent Products Liability**
                                               3. **Negligent Misrepresentation**
15         v.                                  4. **Fraudulent Misrepresentation**
                                               5. **Concealment**
16 **Tesla, Inc.,** a Delaware corporation, and 6. **Negligent Infliction of Emotional**
   DOES 1 through 100, inclusive,                 **Distress**
17                                             7. **Wrongful Death**
               Defendants.
18                                             **JURY TRIAL DEMANDED**

19

20         Plaintiffs CALEB MENDOZA, EDUARDO and MARIA MENDOZA, and ESTATE OF

21 GENESIS GIOVANNI MENDOZA MARTINEZ, by and through its personal representatives

22 Eduardo and Maria Elena Mendoza allege on information and belief as follows:

23                              **PARTIES**

24         1.    Plaintiff CALEB MENDOZA ("Plaintiff" or "Mendoza") is an adult, and at all times

25 was, an adult citizen of California who resides on Bethal Island, County of Contra Costa in California.

26         2.    Plaintiffs EDUARDO and MARIA MENDOZA are, and at all times were, adult

27 citizens of California who reside on Bethal Island, County of Contra Costa in California. Plaintiffs

28 are the mother and father of Decedent GENESIS GIOVANNI MENDOZA MARTINEZ

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1
**COMPLAINT**

1    ("Giovanni").

2       3.      GENESIS GIOVANNI MENDOZA MARTINEZ ("Giovanni") was born June 21,

3    1991. He died at the age of 33 years old as a direct and proximate result of the misconduct of the

4    Defendants as alleged herein. Prior to his death, Giovanni suffered damages as a direct and proximate

5    result of the misconduct of the Defendants as alleged herein.

6       4.      Plaintiffs Eduardo and Maria Elena Mendoza in their capacity as personal

7    representatives of the ESTATE OF GENESIS GIOVANNI MENDOZA MARTINEZ, brings a

8    survival action pursuant to Code of Civil Procedure section 337.30 to recover the damages Giovanni

9    suffered prior to his death.

10      5.      Defendant TESLA, INC. ("Tesla") is a Delaware corporation that had its principal

11   place of business in Palo Alto, California, from approximately 2003 until December 1, 2021, at which

12   point it moved its principal place of business to Austin, Texas. Tesla designs, develops, manufactures,

13   tests, markets, distributes, sells, and leases electric vehicles under the brand name "Tesla." It also

14   offers services related to those vehicles, including designing, developing, and periodically sending

15   over-the-air updates for advanced driver assistance systems ("ADAS") software in Tesla vehicles.

16   Tesla was the manufacturer of a Tesla Model S with license number 7HSJ063 and VIN

17   5YJSA1H10EFP44876, referenced throughout this complaint as the "Subject Vehicle."

18                                **DOE PARTIES**

19      6.      The true names or capacities, whether individual, corporate, associate, or otherwise

20   of Defendants Does 1 to 100, inclusive and/or the factual bases of liability of Defendants Does 1

21   through 100 are unknown and Plaintiffs therefore sue said defendants by such fictitious names

22   pursuant to the Code of Civil Procedure section 474. Plaintiffs will seek to amend this Complaint to

23   allege the true names and capacities when the same have been ascertained.

24      7.      Plaintiffs are informed and believe that each defendant named herein as a DOE is

25   responsible in some manner for the events, occurrences, and circumstances that form the basis of

26   this suit, in that each defendant designated herein as a DOE is responsible, negligently or in some

27   other actionable manner, for the events and happenings hereinafter referred to and caused injuries

28   and damages proximately thereby to Plaintiffs either through said Defendants' own negligent conduct

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    or through the conduct of their agents, servants, or employees. As used herein the term "Defendants"

2    means all Defendants, including DOES 1 to 100, both jointly and severally, and references by name

3    to any named Defendant shall include all Defendants, both jointly and severally.

4            8.      Plaintiffs are informed and believe and thereon allege that, at all times mentioned

5    herein, Defendants and each of them, were the agents, servants, employees, joint venturers, or

6    contractors of their co-defendants, and in doing the fats herein alleged they were acting within the

7    scope, course and authority of said agency, employment, contract, or joint venture. Each and every

8    defendant, as aforesaid, when acting as a principal, actively participated in, controlled, authorized,

9    aided and abetted, incited, compelled, coerced, directed, or subsequently ratified and/or adopted,

10    each and all of the acts or conduct alleged herein, with full knowledge of all the facts and

11    circumstances, including, but not limited to, full knowledge of each and all of the violations of

12    Plaintiffs' rights and the damages to Plaintiff proximately caused thereby.

### JURISDICTION & VENUE

13

14            9.      The California Superior Court has jurisdiction over this action pursuant to California

15    Constitution Article VI, Section 10 which grants the Superior Court "original jurisdiction in

16    all causes except those given by statute to other trial courts."

17            10.     Tesla is subject to the personal jurisdiction of the courts of the State of California as

18    this lawsuit arises out of, and is directly related to, Tesla's business activities in the State of California.

19            11.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section

20    395 in that the injury to Plaintiffs occurred within the County of Contra Costa.

21            12.     The amount in controversy is well in excess of the Court's jurisdictional threshold of

22    $35,000.

### FACTUAL ALLEGATIONS

23

24    **1.      Tesla continuously misrepresented its cars' ability to provide safe, autonomous**

25    **driving despite an awareness of the deadly consequences.**

26            13.     For the past decade, the auto industry has been developing autonomous vehicle

27    technology.

28            14.     SAE International ("SAE"), is a U.S.-based professional association and standards

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

development organization. In 2014, SAE took a leading role in the development of autonomous vehicle technology standards by publishing the initial version of *SAE J3016 Recommended Practice: Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles*, commonly referred to as the SAE Levels of Driving Automation ("SAE Levels").

15.    The SAE Levels provide a taxonomy of vehicle driving automation systems with detailed definitions for six levels for driving automation, ranging from no driving automation (SAE Level 0) to full driving automation (SAE Level 5).[1] The SAE Levels can be summarized as follows:

- **Level 0—No Driving Automation:** The human driver performs all driving tasks (steering, acceleration, braking, etc.), although vehicles may have safety features like automatic emergency braking and forward collision warning.

- **Level 1—Driver Assistance:** The vehicle has features that provide a small degree of automation over the vehicle's acceleration, braking, or steering (e.g., adaptive cruise control, lane-keeping assistance).

- **Level 2—Partial Driving Automation:** The vehicle can perform multiple driving tasks (e.g., acceleration, steering) but remains under the human driver's constant supervision, responsibility, and control.

- **Level 3—Conditional Driving Automation:** The vehicle can take full control of certain driving tasks such that the human driver need not remain constantly alert but must be ready to intervene upon request from the vehicle.

- **Level 4—High Driving Automation:** The vehicle can perform all driving tasks in specific locations or environments, but human override is still an option.

- **Level 5—Full Driving Automation:** The vehicle can perform all driving tasks under all conditions, with zero human attention or interaction required.

16.    SAE refers to Level 1 and 2 technologies as systems or features that provide "driver support," but reserves the term "automated driving" for Levels 3, 4, and 5.

17.    The SAE levels are a widely accepted international standard and have been adopted by regulatory agencies such as the National Transportation Safety Board ("NTSB"), National Highway Traffic Safety Administration ("NHTSA"), and U.S. Department of Transportation.

18.    Tesla began equipping its vehicles with ADAS technology in 2014. Specifically, Tesla began equipping vehicles hardware that was intended to allow vehicles to automate some steering,

---

[1]    SAE International, *Taxonomy and Definitions for Terms Related to Driving Automation Systems for OnRoad Motor Vehicles* (revised Apr. 30, 2021), https://www.sae.org/standards/content/j3016_202104

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    braking, and acceleration functions, although the software to control those functions was not yet

2    available.

3        19.    At all times relevant to this complaint, Tesla's ADAS technology has only ever been

4    capable of SAE Level 2 autonomy. Tesla's ADAS technology relies primarily on cameras and image-

5    recognition software with limited assistance from a single forward-facing radar unit. By contrast,

6    Level 3 and 4 systems rely on a more robust and expensive combination of cameras, multiple radar

7    units, and one or more light-detection-and-ranging ("LIDAR") units. The general consensus among

8    autonomous vehicle experts is that truly autonomous, self-driving cars cannot be achieved without

9    some reliance on lidar technology. But Tesla has refused to use this technology because of expense

10   and aesthetics.

11       20.    Consistent with the Level 2 limitations of its system, Tesla originally called its ADAS

12   features "advanced driver assistance."

13       21.    But in or about 2014 or 2015, a group of Tesla officers and directors—including

14   Tesla's CEO, Elon Musk—decided to change the name to "Autopilot." Tesla engineers expressed

15   concerns that the name was misleading and suggested less misleading options such as "Copilot."

16   Musk and other Tesla officers and directors rejected those concerns and suggestions.[2] Musk and

17   other Tesla officers and directors favored "Autopilot" specifically because they believed the public

18   would associate it with truly self-driving cars, and that the perception Tesla was making self-driving

19   cars would increase sales, attract investments, and drive up Tesla's stock price.

20       22.    As a result, at all times relevant to this complaint, Tesla has marketed its ADAS

21   technology under various names, including "Autopilot," "Enhanced Autopilot," and/or "Full Self-

22   Driving Capability," all of which falsely—and intentionally—imply that the vehicles equipped with

23   such software can operate at SAE Levels 3, 4, and 5, when in reality they are SAE Level 2 at best.

24   Tesla compounded the public misperception that its cars are self-driving by distributing promotional

25   materials and videos that depict Tesla's vehicles driving themselves with no need for a human driver.

26   _____

27       [2]    Cade Metz & Neal E. Boudette, "Inside Tesla as Elon Musk Pushed an Unflinching
     Vision for Self-Driving Cars," *The New York Times* (Dec. 6, 2021), *available at*
28   https://www.nytimes.com/2021/12/06/technology/tesla-autopilot-elon-musk.html

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    In June 2014, Tesla's CEO and co-founder, Elon Musk stated during a Shareholder Meeting that

2    "I'm confident that—in less than a year—you'll be able to go from highway onramp to highway exit

3    without touching any controls."

4          23.    In October 2015, Tesla released its version 7.0 software, which enabled Autopilot on

5    Model S vehicles. Robert Rose, the head of the Autopilot project, left Tesla shortly before the release.

6    Evan Nakano, a Tesla Autopilot engineer who had worked on safety features, objected that Autopilot

7    was not ready for release. When Tesla ignored his concerns, Nakano resigned in protest and wrote a

8    resignation letter, circulated widely among Tesla employees, that called Autopilot's development

9    "reckless decision making that has potentially put customer lives at risk."[3]

10          24.    By December 2015, Musk was publicly stating Tesla vehicles would drive themselves

11   within about two years. He told Fortune magazine, "I think we have all the pieces, and it's just about

12   refining those pieces, putting them in place, and making sure they work across a huge number of

13   environments—and then we're done. It's a much easier problem than people think it is."[4] Musk also

14   stated, "We're going to end up with complete autonomy, and I think we will have complete autonomy

15   in approximately two years."

16          25.    In January 2016, Musk announced on a conference call with reporters that Autopilot

17   was "probably better" than a human driver. He stated Tesla vehicles would be able to drive

18   significantly better than humans within two to three years, and that within approximately two years

19   drivers would be able to use Tesla's "Summon" feature, which allows drivers to remotely instruct

20   their vehicle to drive to a specified location, to summon a vehicle from the other side of the country.[5]

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

---

[3]    Ianthe Jeanne Dugan & Mike Spector, "Tesla's Push to Build a Self-Driving Car Sparked Dissent Among Its Engineers," *The Wall Street Journal* (Aug. 24, 2017), *available at* https://www.wsj.com/articles/teslas-push-to-build-a-self-driving-car-sparks-dissent-among-its-engineers-1503593742

[4]    Kristen Korosec, "Elon Musk Says Tesla Vehicles Will Drive Themselves in Two Years," *Fortune* (Dec. 21, 2015), *available at* https://fortune.com/2015/12/21/elon-musk-interview/

[5]    Elon Musk, https://twitter.com/elonmusk/status/686279251293777920 (Jan. 10, 2016, 12:11 PM).

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

26.     As a result of the above, thousands of Tesla drivers relied—and continue to rely—on Tesla's ADAS technology as though it were capable of Level 3, 4, or 5 self-driving, when in fact it is incapable of safely handling a variety of routine roadway scenarios without driver input. Predictably, this has led—and will continue to lead—to multiple collisions between Teslas and other vehicles or pedestrians, resulting in death or serious bodily injury.

27.     On January 20, 2016, 23-year-old Gao Yaning, who had a history of relying on Autopilot to drive, was killed in China on the way home from a family wedding when his Tesla Model S crashed at full speed on a highway into the back of a large street sweeper. The facts of the accident strongly indicate that Autopilot was engaged at the time of the crash.[6]

28.     On May 7, 2016, Joshua Brown was killed in Florida when the Autopilot on his Tesla Model S failed to recognize a tractor-trailer crossing in front of his car, which resulted in Brown's car striking and passing under the trailer at 74 mph.[7] The top third of Brown's car was sheared off. Brown was a Tesla enthusiast who had previously made videos of himself using Autopilot, one of which was retweeted by Elon Musk just a few weeks earlier.[8]

29.     Despite these incidents, Tesla officers and directors—including, most notably, Elon Musk—repeatedly doubled-down on the premise that Teslas were, or would soon be, capable of safe, fully autonomous driving with minor software updates.

30.     For example, on June 2, 2016—less than a month after Brown's death—Musk confidently announced that "autonomous driving" was "basically a solved problem," and that Tesla's Autopilot software was already safer than a human driver on highways. "I think we're basically less

---

[6]     Neal Boudette, "Autopilot cited in Death of Chinese Tesla Driver," *The New York Times* (Sept. 14, 2016), *available at* https://www.nytimes.com/2016/09/15/business/fatal-tesla-crash-in-china-involved-autopilot-government-tv-says.html

[7]     NTSB, No. HWY16FH018, Dkt. No. 2, "Crash Summary Report" (June 19, 2017), *available at* https://data.ntsb.gov/Docket/Document/docBLOB?ID=40453253&FileExtension=.PDF&FileName=Crash%20Summary-Master.PDF

[8]     Rachel Abrams & Annalyn Kurtz, "Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla," *The New York Times* (July 1, 2016), *available at* https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html#:~:text=Brown%20became%20a%20victim%20of,in%20a%20self%2Ddriving%20car.

1    than two years away from complete autonomy—complete," Musk said.[9]

2    31.    On July 14, 2016, *Consumer Reports* urged Tesla to "change the name of the Autopilot

3    feature because it promotes a potentially dangerous assumption that the Model S is capable of driving

4    on its own." Instead of using the "misleading" name Autopilot, *Consumer Reports* urged Tesla to "name

5    automated features with descriptive, not exaggerated, titles."[10]

6    32.    On July 20, 2016, Tesla's official blog quoted a post by Musk, in which he

7    misleadingly suggests that lack of regulatory approval was a major challenge Tesla was facing in

8    bringing to market fully self-driving vehicles:

> 9    When true self-driving is approved by regulators, it will mean that you will be able to
> 10   summon your Tesla from pretty much anywhere. Once it picks you up, you will be
>      able to sleep, read or do anything else enroute to your destination. You will also be
> 11   able to add your car to the Tesla shared fleet just by tapping a button on the Tesla
>      phone app and have it generate income for you while you're at work or on vacation.[11]

12   33.    In August 2016, a Tesla with Autopilot engaged crashed into a parked vehicle on a

13   Beijing highway. After the owner stated publicly that Tesla had misrepresented Autopilot's

14   capabilities and misled buyers, Tesla removed from its China website a term that translates as "self-

15   driving" and replaced it with a term that translates as "self-assisted driving."[12] Tesla did not make any

16   similar changes to its U.S. website.

17   34.    In September 2016, Musk—referencing Brown's fatal crash—publicly announced

18   that Tesla had fixed the issue that caused that crash in the latest version of its "Autopilot" software

19   by increasing the system's reliance on radar so that it "would see a large metal object across the

20   road."[13]

21   _____

22   [9]    Recode, "Elon Mush | Full Interview | Code Conference 2016,"
     https://www.youtube.com/watch?v=wsixsRISz4&t=4675s at 1:17:55–1:21:20 (June 2, 2016).

23   [10]    *Consumer Reports*, "Consumer Reports Calls on Tesla to Disable and Update Auto
24   Steering Function, Remove 'Autopilot' Name" (July 14, 2016), *available at*
     https://www.consumerreports.org/media-room/press-releases/2016/07/consumer-reports-calls-
25   on-tesla-to-disable-and-update-auto-steering-function-remove-autopilot-name/

     [11]    Elon Musk, "Master Plan, Part Deux," https://www.tesla.com/blog/master-plan-
26   part-deux (July 20, 2016).

27   [12]    Jake Spring & Alexandria Sage, "Tesla removes 'self-driving' from China website
     after Beijing crash," *Reuters* (Aug. 15, 2016), *available at* https://www.reuters.com/article/us-tesla-
28   china-crash-idUSKCN10Q0L4

     [13]    Neal Boudette, "Elon Musk Says Pending Tesla Updates Could Have Prevented

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

35.     On October 16, 2016, German regulators sent Tesla a formal letter reading, "In order to prevent misunderstanding and incorrect customers' expectations, we demand that the misleading term Autopilot is no longer used in advertising the system." The German government also reminded Tesla vehicle owners that Tesla's ADAS technology required, and could only be safely operated with, constant driver attention and supervision.[14]

36.     On October 19, 2016, Tesla released its Autopilot 2.0 software and announced that all new Tesla cars would come with a new suite of hardware (called Autopilot Hardware 2) consisting of eight cameras, twelve ultrasonic sensors, and a forward-facing radar unit, which Tesla claimed would allow the cars to soon become capable of SAE Level 5 autonomy.[15] To access the hardware, owners would have to pay $5,000 for an "Enhanced Autopilot" feature and another $3,000 for the right to activate Tesla's promised "Full Self-Driving Capability." The Enhanced Autopilot package provided drivers most or all of the features in the FSD package, except for the right to unlimited access to Tesla's soon-to-arrive full self-driving technology, and potential early access to FSD Beta updates Tesla might release on its way perfecting that technology.

37.     As part of the announcement, Tesla published a post on its official company blog titled "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," stating "[w]e are excited to announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver." In the same post, Tesla stated that "[s]elf-driving vehicles will play a crucial role in improving transportation safety and accelerating the world's transition to a sustainable future," and that "[f]ull autonomy will enable a Tesla to be substantially safer than a human driver."[16]

Fatal Crash," *The New York Times* (Sept. 11, 2016), *available at* https://www.nytimes.com/2016/09/12/business/elon-musk-says-pending-tesla-updates-could-have-prevented-fatal-crash.html

[14]     Reuters Staff, "Germany says Tesla should not use 'Autopilot' in advertising," *Reuters* (Oct 16, 2016), *available at* https://www.reuters.com/article/idUSKBN12G0KS

[15]     Alex Nishimoto, "All New Tesla Models Will Feature Level 5-Capable Autopilot Hardware," *Motor Trend* (Oct. 20, 2016), *available at* https://www.motortrend.com/news/new-tesla-models-will-feature-level-5-capable-autopilot-hardware/

[16]     The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-selfdriving-hardware (Oct. 19, 2016).

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

38.     The blog post included a video made by Tesla's Autopilot team in the weeks before the release, which purported to show a Tesla driving itself without any human intervention from the person in the driver's seat, whose hands remain off the steering wheel throughout the video. The video begins with a note saying, "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself." However, multiple Tesla Autopilot employees who worked on the video would later report that the route taken by the car had been charted ahead of time by software that created a three-dimensional digital map (a feature unavailable to drivers using the commercial version of Autopilot), and that the video did not accurately show how the car operated during filming. For example, in portions of the video Tesla did *not* show, the car executed driving tasks poorly, and even crashed into a fence at one point.[17]  Tesla engineers had to run the pre-programmed route multiple times to get a clean video clip that made it appear the car was capable of driving itself. None of these facts were referenced in the video or otherwise disclosed by Tesla. The deceptive and misleading video was later used to promote Autopilot's purported abilities, and indeed is still featured on the company's website as of this writing.[18]

39.     Also on October 19, 2016, the company held a conference call with reporters, during which Musk stated that all new Tesla cars would now include all the cameras, computing power, and other hardware necessary for "full self driving." Musk further stated that Tesla would "be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically from home in LA to let's say dropping you off in Times Square, NY and then having the car parking itself by the end of next year without the need for a single touch."[19] Musk repeatedly represented that autonomous vehicles were safer than human-driven ones, and even warned journalists that they would be "killing people" if they wrote negative articles about self-driving

//

[17]     *See* Metz & Boudette, *supra* note 2.

[18]     *See* Tesla, https://www.tesla.com/autopilot ; Tesla, "Tesla Self-Driving Demonstration," https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long (Nov. 18, 2016).

[19]     Xautoworld, "Transcript: Elon Musk's Autopilot 2.0 Conference Call," https://www.xautoworld.com/tesla/transcript-elon-musk-autopilot-2-conference-call/ (Oct. 19, 2016).

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    technology that dissuaded people from using it.[20]

2        40.    According to reporting by multiple outlets, including the *Wall Street Journal* and *The*

3    *New York Times*, Tesla's decision to promise the technology would be able to provide "Full Self

4    Driving" and Musk's statements at the news conference "took the Tesla engineering team by surprise,

5    and some felt that Musk was promising something that was not possible." Sterling Anderson, who

6    was the head of Tesla's Autopilot program at the time, "told Tesla's sales and marketing teams that

7    they should not refer to the company's technology as 'autonomous' or 'self-driving' because this

8    would mislead the public."[21] In a meeting after the October announcement, someone asked Mr.

9    Anderson how Tesla could brand the product "Full Self-Driving," to which he responded, "This was

10    Elon's decision." Two months later, in December 2016, Mr. Anderson resigned.[22]

11        41.    In March 2018, Apple engineer Walter Huang was killed when the Autopilot on his

12    Tesla Model X became confused at a fork in the highway and caused the car to veer sharply to the

13    left and crash into a concrete barrier in Mountain View, California.[23] In the aftermath of that fatal

14    crash, Tesla publicly released crash data and blamed Huang for the accident, violating its agreement

15    with NTSB not to comment on crashes during the course of an investigation and causing NTSB to

16    remove Tesla as a party to its investigation.

17        42.    In April 2018, a Tesla with Autopilot engaged struck and killed a pedestrian in Japan.

18        43.    On May 11, 2018, a Tesla Model S with Autopilot engaged crashed into a stopped

19    firetruck in South Jordan, Utah, prompting a NHTSA investigation into the collision.[24]

20    _____

21    [20]    Maya Kosoff, "Elon Musk: Self-Driving Car Doubters Are Literally 'Killing
     People,'" *Vanity Fair* (Oct. 20, 2016), *available at* https://www.vanityfair.com/news/2016/10/elon-

22    musk-self-driving-car-doubters-are-literally-killing-people ; Andrew Batiuk, "Tesla October 19th
     2016 Autopilot 2.0 Conference Call With Visuals Added," https://www.youtube.com/watch?v=-

23    vjGEEF_p5E (Oct. 20, 2016).

24    [21]    Metz & Boudette, *supra* note 2.

25    [22]    Dugan & Spector, *supra* note 4.

26    [23]    Hyunjoo Jin, "Factbox: Tesla's Autopilot faces unprecedented scrutiny," *Reuters*
     (Nov. 1, 2022), *available at* https://www.reuters.com/business/autos-transportation/teslas-

27    autopilot-faces-unprecedented-scrutiny-2022-11-01/

28    [24]    Levin, Sam, "Tesla Confirms Autopilot Involved in Utah Crash but Seeks to Blame
     Driver," *The Guardian* (May 17, 2018), *available* at
     https://www.theguardian.com/technology/2018/may/16/tesla-autopilot-utah-crash-confirms -

11

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

44.     In March 2019, Jeremy Banner was killed when his 2018 Tesla Model 3 with Autopilot engaged drove under a tractor-trailer in Florida.[25] Banner's accident was eerily similar to the 2016 accident that killed Joshua Brown when his car drove under a tractor-trailer. The Banner accident indicated that, contrary to its claims in September 2016, Tesla had not fixed this significant flaw in its ADAS technology in the roughly three years after Brown was killed.

45.     In May 2019, Tesla released an update to its ADAS "Navigate" feature, which is designed to automate some lane-change functions. When *Consumer Reports* tested the feature, it found that it cut off other cars without leaving enough space, failed to pass in the correct lane, and sometimes struggled to merge into traffic.

46.     In April 2019, at an event in Palo Alto, California, that Tesla dubbed "Autonomy Day," Musk took to the stage and announced that Tesla vehicles would be capable of full self-driving and autonomously navigating dense urban areas like San Francisco and New York by the end of 2019, and that in two years the company would be making cars without steering wheels or pedals.[26] Musk also stated, "If you fast forward a year, maybe a year and three months, but next year for sure, we will have over a million robo-taxis on the road," and "I feel very confident predicting autonomous robo-taxis for Tesla next year. ... I'm confident we'll have at least regulatory approval somewhere, literally next year." Musk stated the robo-taxis would be a way for Tesla owners to make money when they aren't using their vehicles, with Tesla taking 25 or 30 percent of the revenue and allowing the company to compete with popular ride-hailing services like Uber and Lyft.[27] A few months later, Musk doubled-down on the robo-taxi prediction, tweeting that Tesla would "have a million robotaxis by end of 2020."[28]

---

investigation/

[25]     Jin, *supra* note 25.

[26]     R. Baldwin, "Tesla promises 'one million robo-taxis' in 2020," https://www.engadget.com/2019-04-22-tesla-elon-musk-self-driving-robo-taxi.html (Apr. 22, 2019).

[27]     Tech Insider, "Watch Elon Musk Unveil Plans For A Tesla Ride-Hailing App," https://www.youtube.com/watch?v=YiWbdZ8ItRs  (Apr. 22, 2019); Matt McFarland, "Elon Musk says Tesla will have robo-taxis operating next year," *CNN Business*, https://www.cnn.com/2019/04/22/tech/tesla-robotaxis (Apr. 22, 2019).

[28]     Elon Musk, https://twitter.com/elonmusk/status/1148070210412265473 (July 7,

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

47.     In December 2020, at the Axel Springer award ceremony in Berlin, Musk again touted the capability of Tesla vehicles stating that, "I'm extremely confident of achieving full autonomy and releasing it to the Tesla customer base next year."[29] He also vouched for the safety of Tesla's Autopilot by stating, "Now, there's an uncertain period of time for when regulatory approval will take, how long it will take, but I think if you are able to accumulate billions of kilometers of autonomous driving, then it's difficult to argue and, look at the accident rate when the car is autonomous versus non-autonomous and in fact, our statistics already show a massive difference when the car is on Autopilot or not on Autopilot. That the safety is much greater even with the current Autopilot software."

48.     Tesla's effort to misrepresent the self-driving capabilities of its cars was not limited to affirmative misrepresentations. In addition, Tesla undertook a widespread campaign to conceal thousands of consumer reports about problems with Tesla's "Autopilot" feature, including crashes, unintended braking, and unintended acceleration.[30] To that end, Tesla officers, directors, and managing agents trained employees to refrain from memorializing customer reports in writing. When Tesla employees did respond to customer reports in writing, it was only to reassure customers that the "Autopilot" feature was working as intended. In addition, Tesla—in violation of Civil Code section 1670.8—forced consumers to sign nondisclosure agreements to receive repairs under warranty.

## 2. Giovanni died and Caleb was seriously injured when Giovanni bought a Tesla Model S with Autopilot from its prior owner and trusted it to drive—in reliance on Tesla's misrepresentations.

49.     Giovanni was one of many members of the public exposed to Tesla's long-term advertising campaign designed to persuade the public that its vehicles were capable of driving themselves. Not only was he aware that the technology itself was called "Autopilot," he saw, heard, and/or read many of Tesla or Musk's deceptive claims on Twitter, Tesla's official blog, or in the news

2019, 8:24 PM).

[29]     Alex Springer SE, "Axel Springer Award 2020" (December 1, 2020) *available at* https://www.youtube.com/watch?v=AF2HXId2Xhg

[30]     Russ Mitchell, *Huge Tesla data leak reportedly reveals thousands of safety complaint. 4 things to know* (May 26, 2023), https://www.latimes.com/business/story/2023-05-26/tesla-autopilot-alleged-data-breach-leak

media, some samples of which are alleged above. Giovanni believed those claims were true, and thus believed the "Autopilot" feature with the "full self driving" upgrade was safer than a human driver, and could be trusted to safely navigate public highways autonomously.

50.     Relying on this belief-- which was the direct result of the product name itself and Tesla's long-term advertising campaign--Giovanni purchased a Tesla Model S from its prior owner, Jorge Ventura, on March 4, 2021. And in further reliance on this belief, Giovanni trusted the "Autopilot" feature to drive the vehicle autonomously on the freeway regularly.

51.     When Giovanni purchased the Tesla Model S, he understood that the vehicle would drive itself and he no longer needed to drive it. Based on representations Giovanni heard made by Musk, Giovanni believed the vehicle was a safer driver than a human and relied on it to perceive and react to traffic in front of him.

52.     Indeed, on or around February 18, 2023, at approximately 3:54 a.m. Giovanni was traveling in the Subject Vehicle with "Autopilot" engaged in the number two lane on Interstate 680 northbound when the Subject Vehicle collided with a fire truck, a 2016 Pierce Aerial, that was parked diagonally, blocking the number one and number two lanes for traffic control due to an unrelated traffic emergency.  A second firetruck was on the scene as well as two CHP vehicles. Both firetrucks and both CHP vehicles had their emergency lights flashing. Giovanni's brother, Plaintiff Caleb Mendoza, was the front seat passenger in the Subject Vehicle. At the time of the collision, Giovanni was not controlling the Subject Vehicle, but he was instead passively sitting in the driver's seat with the "Autopilot" feature engaged. In fact, data from the Tesla itself showed that the Subject Vehicle was in "Autopilot" for approximately 12 minutes prior to the crash, with no accelerator pedal or brake pedal inputs from Giovanni during that time. The approximate speed of the Subject Vehicle was 71 mph during the 12-minute period. Data also showed that Giovanni generally maintained contact with the steering wheel until the time of the crash.

53.     As a result of the collision, the Subject Vehicle sustained major frontal damage, crushing Giovanni's body. Giovanni survived, at least momentarily, but subsequently died from the injuries he sustained in the collision.

//

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

**3.    Tesla continues to misrepresent the self-driving capabilities of its cars, motorists continue to die, and regulators have ongoing investigations into Tesla for fraud.**

54.    Despite the numerous accidents, news reports, and investigations exposing the danger of Tesla's ADAS technology—including the incident that forms the basis of this case—Tesla continues its deceptive and misleading marketing practices concerning its ADAS technology in conscious disregard for the public's safety.

55.    In October 2019, *Consumer Reports* tested Tesla's "Smart Summon" feature, which Tesla claimed would allow owners to use a smartphone app to "summon" their Tesla vehicle to drive itself across a parking lot without any occupants inside the vehicle. *Consumer Reports'* testing revealed that the feature had difficulty navigating a parking lot, with the summoned car crossing lane lines and wandering erratically "like a drunken or distracted driver."[31] This was nearly four years after Musk's January 2016 tweet that Tesla was two years away from its customers being able to use Summon to have their car come to them even if it was thousands of miles away.

56.    Tesla's deceptive marketing is so egregious that it has drawn scrutiny from governmental regulators at the state, federal, and international level.

57.    In February 2020, the NTSB called on NHTSA to set stricter standards on Autopilot, citing the high number of Autopilot-related collisions and deaths.

58.    In August 2020, a couple was killed in Saratoga, California, after their Tesla veered off a highway while Autopilot was active.

59.    In September 2020, *Consumer Reports* published the first in a series of evaluations of Tesla's "Full Self-Driving Capability" technology, finding that the technology caused vehicles to engage in unusual and unsafe behavior, such as stopping at green lights, driving through stop signs, slamming on the brakes for yield signs when the merge was clear, and stopping at every exit while going around a traffic circle.[32]

---

[31]    Jeff Plungis, "Tesla's Smart Summon Performance Doesn't Match Marketing Hype," *Consumer Reports* (Oct. 8, 2019), *available at* https://www.consumerreports.org/automotive-technology/teslas-smart-summon-performance-doesnt-match-marketing-hype/

[32]    Mike Monticello & Keith Barry, "Tesla's 'Full Self-Driving Capability' Falls Short of Its Name," *Consumer Reports* (Sept. 4, 2020) (last updated May 19, 2021), *available at* https://www.consumerreports.org/autonomous-driving/tesla-full-self-driving-capability-review-falls-short-of-its-name-a1224795690/

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

60.     In a January 2021 earnings call during which Tesla reported $721 million in profit for 2020,[33] Musk stated that the company had made "massive progress on Full Self-Driving," and that it "will become obvious later this year" that "Tesla Autopilot is capable of full self-driving." Musk also stated, "I'm highly confident the car will drive itself for the reliability in excess of a human this year. This is a very big deal." When a financial analyst asked Musk why he was confident Tesla would achieve SAE Level 5 autonomy in 2021, Musk responded, "I'm confident based on my understanding of the technical roadmap and the progress that we're making between each beta iteration."[34]

61.     Six weeks later, on a March 9, 2021, phone call with California DMV regulators, Tesla's director of Autopilot software, CJ Moore, contradicted Musk. According to an internal DMV memo memorializing the call, "DMV asked CJ to address, from an engineering perspective, Elon's messaging about L5 [Level 5] capability by the end of the year. Elon's tweet does not match engineering reality per CJ." In response to a question from DMV regulators about "how Tesla evaluates the potential advancement of levels of autonomy," Tesla representatives "indicated they are still firmly in L2 [Level 2]." Tesla further told DMV that "[t]he ratio of driver interaction would need to be in the magnitude of 1 or 2 million miles per driver interaction to move into higher levels of automation [i.e., Level 3 and higher]."[35] In other words, drivers would need to intervene only once per 1 to 2 million miles before Tesla would proceed to Level 3 software. Tesla's ADAS software, which routinely makes mistakes, is not even remotely close to this level of reliability.

62.     In May 2021, under pressure from the Transportation Committee of the California Senate, the California Department of Motor Vehicles launched an investigation into whether Tesla is deceptively marketing its ADAS technology as making its cars capable of autonomous driving.[36]

---

[33]     Chris Isidore, "Tesla just proved all its haters wrong. Here's how," *CNN Business*, https://www.cnn.com/2020/01/31/investing/tesla-cash-crunch/index.html (Jan. 31, 2020).

[34]     Tesla (TSLA) Q4 2020 Earnings Call Transcript (Jan. 27, 2021), *available at* https://www.fool.com/earnings/call-transcripts/2021/01/27/tesla-tsla-q4-2020-earnings-call-transcript/

[35]     Memorandum to File by Miguel Acosta (DMV) Re: Tesla AP City Streets Update (Mar. 9, 2021), available at https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/

[36]     Russ Mitchell, "DMV probing whether Tesla violates state regulations with self-driving claims," *Los Angeles Times* (May 17, 2021), *available at*

COMPLAINT

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

63.    In June 2021, in what was widely seen as a response to motor vehicle collisions involving Tesla's ADAS technology, NHTSA issued an unprecedented order requiring automobile manufacturers to report any crash involving an injury, fatality, or property damage that happens while or immediately after a vehicle is automating some driving tasks.

64.    In early July 2021, Tesla released the Beta 9 version of its "Full Self-Driving" (or "FSD") software to certain Tesla vehicle owners. Following the release, Tesla owners took videos of the software in action that show vehicles missing turns, scraping against bushes, and veering toward parked cars.

65.    In August 2021, NHTSA opened a preliminary safety defect investigation (PE21-020) into Autopilot, based on eleven incidents involving Tesla vehicles, operating with Autopilot engaged, striking stationary first responder vehicles that were tending to prior collision scenes.

66.    Also in August of 2021, U.S. Senators called for the Federal Trade Commission to investigate what they referred to as Tesla's potentially deceptive marketing practices surrounding its FSD technology, including Tesla's use of the phrase "full self-driving" to describe and market a feature that does not make the vehicle fully self-driving.

67.    On August 31, 2021, NHTSA ordered Tesla to produce documents and information regarding the design of its FSD technology, crashes involving that technology, and marketing materials that make representations about that technology. On the date that was the deadline for compliance, Tesla submitted only a partial response to NHTSA, claiming that the documents and information it had requested was confidential business information.

68.    Tesla has long been aware of limitations in Autopilot's ability to use the current vision system, and the fact that these limitations may lead to missed detections of first responder/law enforcement vehicles. Specifically, in the Subject Vehicle, Telsa knew that its vision system did not differentiate emergency vehicles with activated caution lights from other vehicles on the road during the day or night. Tesla's vision system in the Subject Vehicle was based on single frames, which means that it sees each moment of time individually, and using each single frame, tries to detect a vehicle in only that frame. When flashing lights exist at a scene, the frames alternate between

https://www.latimes.com/business/story/2021-05-17/dmv-tesla-california-fsd-autopilot-safety

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    extremely saturated frames and extremely dark frames. The Autopilot system sees the frames as either

2    very bright or very dark, rather than interpreting the changing light intensity as a caution signal as a

3    human would. This limitation based on the single frame interpretation leads to missed detections in

4    the system.

5        69.    In September of 2021, approximately eighteen months before the crash involving

6    Messrs. Mendoza Tesla made a software update to enhance system detectability for caution lights

7    associated with emergency vehicles. Despite this update, Teslas continued to crash into first

8    responder/law enforcement vehicles, causing injury and death.

9        70.    Following Tesla's software update, NHTSA made two additional requests to Tesla,

10   one of which was an information request letter "to obtain information on the company's chances to

11   subject vehicles' functionality through software updates intended to improve the detection of

12   emergency vehicle lights in low light conditions."

13       71.    Regarding its updates, Tesla has acknowledged that while its updates may improve

14   the system's detection and response capabilities for caution lights, they would not work for all Tesla

15   vehicles.  In fact, for nearly a year and a half before the subject crash Tesla knew that it's over-the-

16   air software fix to improve detection of caution lights would not work on the Subject Vehicle.  The

17   software fix was simply not compatible with Tesla's operating on its earlier operating system known

18   as Hardware 1.

19       72.    By way of analogy with another ubiquitous consumer device, Apple routinely updates

20   its IOS software such earlier versions of the iPhone are no longer capable of running the latest

21   software.  In other words the software for an iPhone 16 doesn't work on iPhone 3.  However, while

22   that planned obsolescence is an inconvenience for phone users, here Tesla decided that hundreds of

23   thousands of vehicles operating on Hardware 1 would continue to pose a threat to emergency

24   responders because of the vehicles' inability to perceive and react to caution lights.

25       73.    Autopilot system in the Subject Vehicle did not differentiate the emergency vehicles

26   with activated caution lights from other vehicles on the road on the night of February 18, 2023. The

27   Autopilot system saw single frames in the vision system that were either very dark or very bright,

28   leading to the missed detection of the emergency vehicles with activated caution lights, causing the

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1   Tesla Model S to crash into the emergency vehicles, killing Giovanni, severely injuring Caleb and

2   injuring several first responders on-scene.

3       74.     Tesla's updates have a history causing problems. An update to the FSD Beta software

4   in October 2021 caused a major increase in "phantom braking" incidents, in which the software

5   identifies a non-existent threat that triggers the vehicle's emergency braking system. The result is that

6   Tesla vehicles, traveling at various speeds, were suddenly slamming on the brakes for no apparent

7   reason. Tesla initially claimed it had identified the source of the problem and fixed it with a software

8   update released on October 25, 2021, but subsequently issued a formal recall over the issue for the

9   more than 11,000 vehicles using the FSD Beta software in an effort to head off adverse action by

10  U.S. regulators.[37]

11      75.     Tesla's claims of having fixed the problem turned out to be false, as there were 107

12  NHTSA driver complaints in the three-month period of November 2021 through January 2022 about

13  "phantom braking" issues (compared with only 34 such complaints in the preceding 22 months). The

14  NHTSA complaints included everything from phantom braking incidents that were "happening with

15  NOTHING present in front of my vehicle, and sometimes with nothing around me at all," to an

16  incident where Tesla software slammed on the brakes in response to a plastic bag.[38]

17      76.     On November 18, 2021, CNN Business reported that it spent a morning testing

18  Tesla's FSD technology on the streets of New York City and "watched the software nearly crash into

19  a construction site, try to turn into a stopped truck and attempt to drive down the wrong side of the

20  road." The FSD software reportedly "needed plenty of human interventions to protect us and

21  everyone else on the road," including a driver intervention "every couple of blocks or so" and

22  multiple instances in which the driver "quickly jerked the wheel to avoid a crash."[39]

23  _____

24      [37]    Tom Krisher, "Tesla software recall may head off fight with US regulators,"
    *Associated Press* (Nov. 2, 2021), *available at* https://apnews.com/article/technology-business-
25  software-d3e2107435f432fd9b36ba14898166a0

26      [38]    Faiz Siddiqui & Jeremy B. Merrill, "Tesla drivers report a surge in 'phantom
    braking,'" *The Washington Post* (Feb. 2, 2022), *available at*
27  https://www.washingtonpost.com/technology/2022/02/02/tesla-phantom-braking/

28      [39]    Matt McFarland, "We tried Tesla's 'full self-driving.' Here's what happened," CNN
    Business, https://www.cnn.com/2021/11/18/cars/tesla-full-self-driving-brooklyn/index.html
    (Nov. 18, 2021); CNN, "CNN tests a 'full self-driving' Tesla,"

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

77. On December 6, 2021, *The New York Times* published an article about its investigation into the failures of Tesla's ADAS technology based on interviews with 19 Tesla employees who had worked on design, developing, and testing that technology at Tesla over the prior decade. The article reported that interviews with the employees indicated that Musk "repeatedly misled" the public about the abilities of Tesla's ADAS technology.[40]

78. As of May 15, 2022, nearly a year after the NHTSA issued its unprecedented order requiring automobile manufacturers to report any crash that happens while or immediately after a vehicle is automating some driving tasks, auto manufacturers reported 392 accidents in total. Tesla accounted for 70 percent of those reports, reporting 273 accidents from June of 2021 to May 15, 2022. Honda was second with 90 accidents, followed by Subaru at 10, and Ford at five.[41]

79. On June 8, 2022, NHTSA upgraded its Preliminary Evaluation (PE) 21-020 to Engineering Analysis (EA) 22-002 to study the potential for driver misuse when Autopilot is engaged. NHTSA listed additional collisions between Tesla vehicles and vehicles stopped at first responder scenes to the eleven collisions reported between January 2018 and July 2021 that it was already investigating. The subject collisions investigated by NHTSA include, but are not limited to, the following collisions:

a. A collision in January of 2018 in which a Tesla Model S struck a firetruck parked along Interstate 405 in Culver City, California. NTSB conducted an investigation into the crash, determining that the driver was overly reliant on the system and that Autopilot's design let him disengage from driving.[42]

b. A collision in December of 2019 in Norwalk, Connecticut in which a Telsa Model 3

https://www.youtube.com/watch?v=2PMu7MD9GvI (Nov. 18, 2021).

[40] Metz & Boudette, *supra* note 2; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long

[41] Michael Wayland, "U.S. safety agency says Tesla accounts for most driver-assist crashes, but warns data lacks context" *CNBC* (June 15, 2022) *available at* https://www.cnbc.com/2022/06/15/data-shows-tesla-accounts-for-most-reported-driver-assist-crashes-but-officials-warn-report-lacks-context.html

[42] National Transportation Safety Board, Highway Accident Brief, "Rear End Collision Between a Car Operating with Advanced Driver Assistance Systems and a Stationary Fire Truck, Culver City, California, January 22, 2018," Report Date: August 22, 2019.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

on Autopilot crashed into the back of a police cruiser that was parked on the highway with its emergency lights on and flares placed behind it.[43] The trooper was assisting another driver that had been involved in an unrelated crash.

    c.   A collision in December of 2019, in which a Telsa Model 3 on Autopilot crashed into the rear of a parked fire truck in on a highway in Cloverdale, Indiana, killing the front seat passenger and seriously injuring the driver. The fire truck was parked in the passing lane on the highway with its emergency lights on.[44]

    d.   A collision in January of 2020 in which a Telsa operating on Autopilot crashed into a Massachusetts State Police cruiser that was stopped on in the left lane of a highway in Bridgewater around 10 p.m.[45]

    e.   A collision in July of 2020 in Cochise County, Arizona in which a Tesla Model S on Autopilot slammed into the back of a state trooper's SUV that was parked on the shoulder of the highway with its emergency lights activated.[46]

    f.   A collision in August of 2020 in North Carolina in which a Tesla on Autopilot crashed into patrol cars from the Nash County Sheriff's Office and State Highway Patrol parked along Highway 64.[47] The incident occurred at night while another traffic crash was being investigated. The patrol cars had their emergency lights activated.

---

[43]    Torres, Ella. "Tesla on Autopilot Slams into Police Cruiser, Driver Claims He Was Checking on His Dog." ABC News. ABC News Network, December 7, 2019. https://abcnews.go.com/US/tesla-autopilot-slams-police-cruiser-driver-claims-checking/story?id=67570199

[44]    Slaby, MJ. "One Dead after Vehicle Hits Firetruck Parked on I-20." Indianapolis Star. December 29, 2019. https://www.indystar.com/story/news/2019/12/29/one-dead-after-tesla-hits-parked-fire-truck-70/2771593001/

[45]    Kath, Ryan. "Federal Government Investigating Tesla Crash in Massachusetts." 10Boston. November 13, 2020. https://www.nbcboston.com/investigations/federal-government-investigating-tesla-crash-in-massachusetts/2229521/?os=vb&ref=app

[46]    Minkler, Alana. "Tesla on Autopilot Crashes into DPS Patrol Car on I-10." The Arizona Republic. Arizona Republic, July 15, 202. https://www.azcentral.com/story/news/local/arizona-breaking/2020/07/14/tesla-autopilot-hits-dps-patrol-car-10-near-benson/5439368002/

[47]    "Dash Cam Video Released from 2020 Tesla Autopilot Crash that Injured 2 Law Enforcement Officers." 11ABC Eyewitness News. February 9, 2022. https://abc11.com/tesla-tesla-crash-car-accident-dash-camera-nash-county-officers-police/11548699/

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

g. A collision in February of 2021 in which a Tesla Model X with Autopilot engaged crashed into a cruiser working an active scene with flashing lights on the freeway in Montgomery County, Texas.[48]

h. A collision in March of 2021 in which a Tesla on Autopilot crashed into a parked police car with flashing lights on Interstate 96 near Lansing, Michigan. The trooper was investigating a car crash at approximately 1:10 a.m. when the Tesla struck his car.[49]

i. A collision in Florida in May of 2021 in which a Tesla slammed into a Road Ranger truck with emergency lighting that was being used by police to block an express lane on the highway for a previous crash.[50]

j. A collision in July of 2021 in which a Tesla on Autopilot drove through a freeway closure at approximately 1:45 a.m. and slammed into the back of a California Highway Patrol officer's car in San Diego, California.

k. A collision in August of 2021 in which a Tesla Model 3 on Autopilot struck a stopped Florida Highway Patrol car and a disabled car that the Florida state trooper had stopped to assist on the highway.[51]

80. On July 13, 2022, the Dawn Project, an organization dedicated to increasing the software safety, published a paper regarding its testing of a Tesla Model 3 equipped with FSD Beta 10.12.2 (released on June 1, 2022) on a closed racetrack. The purpose of the testing was to determine

[48] Campbell, Dawn and Andy Cerota. "Lawsuit Filed Against Tesla After Accident that Injured 5 Police Officers." Click2Houston.com. September 27, 2021. https://www.click2houston.com/news/local/2021/09/27/lawsuit-filed-against-tesla-after-accident-that-injured-5-police-officers/

[49] Associated Press. "Tesla on Autopilot Drives into Michigan Trooper's Patrol Car." ABC News. ABC News Network, March 17, 2021. https://abcnews.go.com/US/wireStory/tesla-autopilot-drives-michigan-troopers-patrol-car-76524732

[50] Batchelor, Amanda. "3 Injured After Tesla Collides with Road Ranger Truck on 1-95." Local 10.com. May 19, 2021. https://www.local10.com/news/local/2021/05/19/3-injured-after-tesla-collides-with-road-ranger-truck-on-i-95/

[51] Associated Press. "Tesla on Part-Automated Drive System Slams into Police Car." https://wagmtv.com, August 28, 2021. https://www.wagmtv.com/2021/08/28/tesla-part-automated-drive-system-slams-into-police-car/

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1  the FSD software's safety in terms of its ability to detect and avoid hitting small children. The testing

2  was performed on a closed racetrack with the Tesla driving itself between a long row of cones with

3  a child-sized mannequin placed in plain view at the end of the row—i.e., conditions significantly less

4  complex and more favorable to the FSD software than those that would be encountered in the real

5  world. Nevertheless, the testing found Tesla's FSD software consistently failed to detect the

6  stationary child-size mannequins and "d[id] not avoid the child or even slow down," but instead

7  "repeatedly struck the child mannequin in a manner that would be fatal to an actual child."[52]

8       81.    On July 14, 2022, the editor-in-chief of Electrek, a website that covers electric

9  vehicles, published an article reviewing his experience of using Tesla's FSD Beta software over the

10  course of two months. His ultimate conclusion was that, despite years of development and updates

11  by Tesla, FSD Beta's "decision-making is still the equivalent of a 14-year-old who has been learning

12  to drive for the last week and sometimes appears to consume hard drugs."[53]

13       82.    On July 28, 2022, following a year-long investigation, the California DMV, which

14  licenses motor vehicle manufacturers and dealerships in California (including Tesla's Fremont factory

15  and dozens of Tesla retail stores), brought two related administrative enforcement actions against

16  Tesla for "untrue," "misleading," and "deceptive" marketing of its Autopilot and FSD technology.

17  The DMV specifically alleged that Tesla's use of the product labels "Autopilot" and "Full Self Driving

18  Capability," as well as statements about those technologies that have appeared on Tesla's website in

19  2022, "represent that vehicles equipped with those ADAS [advanced driver assistance system]

20  features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features

21  could not at the time of those advertisements, and cannot now, operate as autonomous vehicles."

22  For relief, the DMV seeks restitution and the revocation or suspension of Tesla's California vehicle

23  manufacturer license and vehicle dealer license.[54]

---

24      [52]    The Dawn Project, *In Scientific Test, Tesla "Full Self-Driving" Technology Consistently

25  *Strikes Child-Sized Mannequins* (July 13, 2022), *available at* https://dawnproject.com/wp-content/uploads/2022/08/The_Dawn_Project___Tesla_FSD_Test_8_.pdf

26      [53]    Fred Lambert, "Elon Musk does the impossible and manages expectations on

27  Tesla's next Full Self-Driving update," *Electrek* (July 14, 2022), *available at* https://electrek.co/2022/07/14/elon-musk-manages-expectations-tesla-next-big-full-self-driving-update/

28      [54]    *See In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a Vehicle*

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

83.     All told, Tesla received thousands of customer reports regarding problems with Tesla's "Autopilot" system between 2015 and 2022, including over 1,000 crashes; over 1,500 complaints about sudden, unintentional braking; and 2,400 complaints about sudden acceleration.[55]

84.     On December 2023, Telsa acknowledged the defective nature of its ADAS technology by issuing a recall of every vehicle it had ever manufactured pursuant to Part 573 Safety Recall Report 23V-838. On the heels of the 'over the air' software 'fix' that Tesla pushed out in response to the recall, NHTSA opened a recall query in May 2024 to analyze the efficacy of Tesla's recall efforts. Tesla's response to NHTSA's further investigation into Tesla's defective ADAS technology is on-going.

85.     At all relevant times, Defendant TESLA and DOES 1-30 were and are engaged in the business of manufacturing, engineering, fabricating, designing, assembling, importing, distributing, selling, inspecting, servicing, repairing, marketing, advertising, warranting, modifying, equipping, and leasing, renting, wholesaling, and selling the Subject Vehicle. Defendants knew, or in the exercise of reasonable care should have known, the Subject Vehicle would be used in the manner described herein, without inspection for defects in its function, parts, or design, including, but not limited to, as to Autopilot mode, for use in the State of California and elsewhere. At all relevant times, the Subject Vehicle, and similar vehicles, were designed, manufactured, marketed, advertised, and placed into the stream of commerce by TESLA and DOES 1-30, and each of them, and their officers, directors, employers, salespeople, contractors, and/or managing agents.

86.     At all relevant times, the Subject Vehicle contained design, manufacturing, and warning defects which posed an unreasonable risk of injury or death to consumers, and others similarly situated, and to other motorists sharing the road with TESLA's vehicles, including the Subject Vehicle. The Subject Vehicle and each of its component parts was unsafe and dangerous when used for its intended use and reasonably foreseeable misuses by reason of defects in its design

---

*Manufacturer*, Case No. 21-02188, Accusation (July 28, 2022); *In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc.*, a Vehicle Dealer, Case No. 21-02189, Accusation (July 28, 2022).

[55]     Russ Mitchell, *Huge Tesla data leak reportedly reveals thousands of safety complaint. 4 things to know* (May 26, 2023), https://www.latimes.com/business/story/2023-05-26/tesla-autopilot-alleged-data-breach-leak

SINGLETON·SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    and/or manufacturing and/or failure to warn by said Defendants, and each of them.

2       87.    The Subject Vehicle was used by Giovanni on or about February 18, 2023, as intended

3    and in a reasonably foreseeable manner. The Subject Vehicle did not perform as TESLA and DOES

4    1-30 claimed the vehicle would perform and as ordinary consumers expect these vehicles to perform.

5    The Subject Vehicle was travelling in excess of the speed limit and at a speed that was unsafe for

6    traffic conditions. TESLA's Autopilot did not timely perceive, sense, or react to changing traffic

7    conditions in front of the Subject Vehicle; did not perceive, react, and avoid commonly occurring

8    roadway and traffic conditions and hazards, including but not limited to the presence of first

9    responder/emergency vehicles; and did not brake or otherwise take evasive action to prevent the

10   collision with the first responder/emergency vehicles.

11      88.    The Subject Vehicle and similar vehicles manufactured and/or sold by TESLA and

12   DOES 1-30 are deceptive and unsafe, including but not limited to, as a result of TESLA conferring

13   to their customers a false sense of security that Autopilot has autonomous functionality or is

14   otherwise safe in all traffic collisions, including freeway conditions and in excess of freeway speeds.

15   As a foreseeable consequence, TESLA's customers believe they are operating an "autonomous"

16   vehicle and are less attentive to roadway conditions and hazards, are less focused on driving, and

17   have a diminished attention to the roadway and to avoid collisions. Ordinary consumers and users

18   do not appreciate, and are not properly informed of, the potential risks, dangers, and limitations of

19   TESLA's Autopilot functionality and ability.

20      89.    Plaintiff is informed and believes and herein alleges that prior to February 18, 2023,

21   Defendants knew and were aware of the manufacturing, design, and warning defects, including but

22   not limited to those related to Autopilot. Defendants knew or should have known of the dangerous

23   and defective nature of the Subject Vehicle from their own internal inspections, testing, and quality

24   control procedures, and from prior collisions, lawsuits, warranty claims, and/or news articles.

25   Defendants should have put in place features to limit the use and/or protect their consumers and

26   others on the roadway against these dangers.

27      90.    Despite their awareness of the defects in the Subject Vehicle, Defendants, and each

28   of them, failed to warn Giovanni and/or other purchaser and users of TESLA's vehicles of said

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1   dangers, defects, and limitations of the Subject Vehicle, and failed to properly inform their consumers

2   and others of the limitations of Autopilot. To the contrary, TESLA misleadingly promotes the

3   functionality, safety, and autonomy of Autopilot as alleged herein.

4       91.     As a direct and legal result of the conduct of Defendants and each of them, and of

5   the defects inherent in the Subject Vehicle, Plaintiff Caleb Mendoza sustained serious personal

6   injuries and his brother, Giovanni, died in the collision.

7                        **First Cause of Action**
                         **Strict Products Liability**
8                 (Against Defendant Tesla and Does 1–50)

9       92.     Plaintiffs incorporate herein each and every allegation set forth in the preceding

10  paragraphs as though fully set forth herein.

11      93.     Plaintiffs were harmed by the Subject Vehicle, a product that is manufactured,

12  distributed, marketed, advertised, and sold by Defendants TESLA and DOES 1–50.

13      94.     At the time Defendants sold the Subject Vehicle, the Subject Vehicle was dangerous,

14  hazardous, and unsafe both for its intended use and/or for its reasonably foreseeable misuses. The

15  Subject Vehicle contained inherent vices and defects both in design and manufacturing, and by

16  Defendants' failures to warn of the Subject Vehicle's defects and limitations, all of which Defendants

17  were aware at all relevant times.

18      95.     At all relevant times, Defendant TESLA and DOES 1–50 directly and/or indirectly

19  claims Autopilot is a combination of hardware and software that performs the dynamic driving task.

20  Defendant TESLA and DOES 1–50 advertise, market, and claim that Autopilot is safe and as good

21  as or better than a human driver at detecting hazards, changing conditions, and traffic. Consumers

22  are informed and expect that TESLA's "Autopilot" vehicles will drive safely and autonomously, and

23  will steer, maneuver, brake, accelerate, lane keep, detect, avoid, and adapt to hazards and changing

24  traffic conditions in real time without human input. At all relevant times, TESLA distributed

25  promotional materials and videos that depict TESLA's vehicles without a natural person in the

26  vehicle. TESLA's advertising, marketing, and promotions depict Autopilot as an autonomous

27  function that is safe in any traffic conditions.

28      96.     At all relevant times, Defendant TESLA and DOES 1–50 did not place reasonable

SINGLETON·SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    parameters or limitations on their customers for the use of Autopilot. Owners are allowed to use

2    Autopilot in any manner, traffic, or conditions, including on metropolitan freeways and at speeds in

3    excess of the speed limit.

4         97.    TESLA refuses to implement technology that would warn drivers to remain focused

5    on driving. For example, other companies have implemented technology to ensure drivers are still

6    engaged when utilizing SAE Level 2 ADAS technology, since evidence shows the average driver

7    tends to rely too much on ADAS technology. To that end, General Motors and Ford use infrared

8    cameras that closely track the driver's eyes and sound warning chimes if a driver looks away from the

9    road for more than two or three seconds. TESLA did not initially include such a driver monitoring

10   system in its vehicles, and later added only a standard camera that is much less precise than infrared

11   cameras in eye tracking.[56]

12        98.    As a foreseeable consequence, TESLA's customers believe they are operating an

13   "autonomous" vehicle and are less attentive to roadway conditions and hazards, less focused on

14   driving, and have a diminished attentiveness and capacity to avoid collisions. Ordinary consumers

15   and users are not properly informed of, and otherwise do not fully appreciate, the potential risks,

16   dangers, and limitations of Autopilot's functionality and ability.

17        99.    At all relevant times, Defendant TESLA and DOES 1–50, knew or with reasonable

18   due care should have known, that their consumers were operating Tesla's vehicles without the human

19   operator's active dynamic input. TESLA knew or with reasonable due care should have known, that

20   numerous crashes, including fatal crashes, have occurred as a result of their customers belief that

21   Tesla's vehicles are autonomous or that Autopilot is an autonomous mode. These foreseeable uses

22   were a direct and proximate result of TESLA's representations that "Autopilot" is an autonomous

23   mode and/or was safe for use without active human dynamic input and supervision.

24        100.   As a result of and based upon TESLA's representations, Tesla's customers regularly

25   transfer complete control of their vehicles to TESLA, including at times when it is dangerous to do

26   so. Similarly, Giovanni used Autopilot and transferred complete control of the Subject Vehicle to

27   _____

28   [56]    Neal E. Boudette, "Federal safety agency expands its investigation of Tesla's
     Autopilot system," *The New York Times* (June 9, 2022), *available at*
     https://www.nytimes.com/2022/06/09/business/tesla-autopilot-nhtsa-investigation.html

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1.  TESLA at the time of the crash.

2      101.    Defendants knew the Subject Vehicle was to be purchased and used without

3   inspection for defects by the users of the vehicle, including but not limited to Giovanni. Defendants

4   did not include sufficient instructions and/or warnings of the potential safety hazards, including but

5   not limited to Giovanni.

6      102.    In manufacturing, distributing, marketing, advertising, and selling its vehicles,

7   including the Subject Vehicle, TESLA acted with conscious disregard for the safety of others.

8   Specifically, TESLA represented to others—including Giovanni—that the Tesla Model S was capable

9   of fully autonomous driving even though TESLA knew the vehicle was not safe for fully autonomous

10  driving. Moreover, TESLA knew that others—including Giovanni—would rely on TESLA's

11  "Autopilot" feature to operate their vehicles on public roadways in their stead, and that this presented

12  a significant risk to others' safety, including other motorists and their passengers.

13     103.    TESLA's conscious decision to expose members of the general public to its

14  defectively designed product is despicable conduct. TESLA made a conscious decision to

15  manufacture, distribute, market, advertise, and sell a defectively designed product it knew exposed

16  members of the general public to a significant risk of harm purely out of a desire to maximize profits.

17  Indeed, TESLA knew that disclosing the true capabilities of its ADAS software would conflict with

18  its desire to improve its financial condition and establish itself as a dominant player in the electric

19  vehicle market, and/or would increase costs and thereby reduce its profit margins. That a major auto

20  manufacturer would expose members of the general public to a significantly increased risk of serious

21  injury or death on public roadways simply to maximize profit is loathsome, contemptable, and/or

22  vile conduct that would be looked down upon by most reasonable, ordinary people.

23     104.    Further, TESLA intentionally misrepresented the safety of their vehicles and ADAS

24  software. TESLA did so to generate excitement about the company's vehicles and thereby improve

25  its financial condition by, among other things, attracting investment, increasing sales, avoiding

26  bankruptcy, driving up TESLA's stock price, and helping to establish TESLA as a dominant player

27  in the electric vehicle market, all at the expense of the public's safety.

28     105.    The Subject Vehicle's failure to perform safely and as expected and the Defendants'

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1  malice, oppression, and/or fraud was a substantial factor in—and a direct and proximate cause of—

2  the collision between the Subject Vehicle and the parked first responder/emergency vehicle, the fire

3  truck.

4          106.    As a result of that collision, Plaintiffs suffered damages in an amount to be proven at

5  trial.

**Second Cause of Action**
**Negligent Products Liability**
(Against Defendant Tesla and Does 1–30)

8          107.    Plaintiffs incorporate herein each and every allegation set forth in the preceding

9  paragraphs as though fully set forth herein.

10         108.    Plaintiffs were harmed by the Subject Vehicle, a product that is manufactured,

11  distributed, marketed, advertised and sold by Defendants TESLA and DOES 1–50.

12         109.    At the time Defendants sold the Subject Vehicle, the Subject Vehicle was dangerous,

13  hazardous, and unsafe both for its intended use and/or for its reasonably foreseeable misuses. The

14  Subject Vehicle contained inherent vices and defects both in design and manufacturing, and by

15  Defendants' failures to warn of the Subject Vehicle's defects and limitations, of which they were

16  aware at all relevant times.

17         110.    Defendants knew the Subject Vehicle was to be purchased and used without

18  inspection for defects by the users of the vehicle, including but not limited to Giovanni. Defendants

19  did not include sufficient instructions and/or warnings of the potential safety hazards, including but

20  not limited to Giovanni.

21         111.    Defendants were negligent in the design, manufacturing, installation, promotion,

22  instructions, and warnings related to the Subject Vehicle, including but not limited to the functionality

23  and limitations of Autopilot. Said negligence includes, but is not limited to, Defendants' failures to

24  place reasonable limitations on the Subject Vehicle's autonomous features, and/or to reasonably

25  warn and advise Tesla's customers about the limitations of Autopilot. As a result, TESLA's

26  customers, including Giovanni, used Autopilot by transferring complete control to TESLA in any

27  manner, traffic, or conditions, including at speeds in excess of the speed limit.

28         112.    TESLA refuses to implement technology that would warn drivers to remain focused

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

29
COMPLAINT

1    on driving. For example, other companies have implemented technology to ensure drivers are still

2    engaged when utilizing SAE Level 2 ADAS technology, since evidence shows the average driver

3    tends to rely too much on ADAS technology. To that end, General Motors and Ford use infrared

4    cameras that closely track the driver's eyes and sound warning chimes if a driver looks away from the

5    road for more than two or three seconds. TESLA did not initially include such a driver monitoring

6    system in its vehicles, and later added only a standard camera that is much less precise than infrared

7    cameras in eye tracking.[57]

8        113.    In manufacturing, distributing, marketing, advertising, and selling its vehicles,

9    including the Subject Vehicle, TESLA acted with conscious disregard for the safety of others.

10   Specifically, TESLA represented to others—including Giovanni—that the Tesla Model S was capable

11   of fully autonomous driving even though Tesla knew the vehicle was not safe for fully autonomous

12   driving. Moreover, TESLA knew that others—including Giovanni—would rely on Tesla's

13   "Autopilot" feature to operate their vehicles on public roadways in their stead, and that this presented

14   a significant risk to others' safety, including other motorists and their passengers.

15       114.    TESLA's conscious decision to expose members of the general public to its

16   defectively designed product is despicable conduct. TESLA made a conscious decision to

17   manufacture, distribute, market, advertise, and sell a defectively designed product it knew exposed

18   members of the general public to a significant risk of harm purely out of a desire to maximize profits.

19   Indeed, TESLA knew that disclosing the true capabilities of its ADAS software would conflict with

20   its desire to improve its financial condition and establish itself as a dominant player in the electric

21   vehicle market, and/or would increase costs and thereby reduce its profit margins. That a major auto

22   manufacturer would expose members of the general public to a significantly increased risk of serious

23   injury or death on public roadways simply to maximize profit is loathsome, contemptable, and/or

24   vile conduct that would be looked down upon by most reasonable, ordinary people.

25       115.    Further, TESLA intentionally misrepresented the safety of their vehicles and ADAS

26   software. TESLA did so to generate excitement about the company's vehicles and thereby improve

27   

28   

---

[57]    Neal E. Boudette, "Federal safety agency expands its investigation of Tesla's Autopilot system," *The New York Times* (June 9, 2022), *available at* https://www.nytimes.com/2022/06/09/business/tesla-autopilot-nhtsa-investigation.html

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    its financial condition by, among other things, attracting investment, increasing sales, avoiding

2    bankruptcy, driving up TESLA's stock price, and helping to establish TESLA as a dominant player

3    in the electric vehicle market, all at the expense of the public's safety.

4        116.    The Subject Vehicle's failure to perform safely and as expected and the Defendants'

5    malice, oppression, and/or fraud was a substantial factor in—and a direct and proximate cause of—

6    the collision between the Subject Vehicle and the parked first responder/emergency vehicle, the fire

7    truck.

8        117.    As a result of that collision, Plaintiffs suffered damages in an amount to be proven at

9    trial.

### Third Cause of Action
### Negligent Misrepresentation
(Against Defendant Tesla and Does 1–100)

12       118.    Plaintiffs incorporate herein each and every allegation set forth in the preceding

13   paragraphs as though fully set forth herein.

14       119.    TESLA represented to members of the general public—including Giovanni—on

15   Twitter, on its blog, in advertising, in promotional materials, and on its website—that the TESLA

16   "Autopilot" feature was capable of "full-self driving" (i.e., capable of safely driving autonomously).

17       120.    This representation was false; the TESLA "Autopilot" feature was not capable of

18   "full self-driving" (i.e., capable of safely driving autonomously). To the contrary, the "Autopilot"

19   feature has only ever been capable of SAE Level 2 automation (i.e., limited driver assistance), even

20   with the so-called "Full Self Driving" upgrade.

21       121.    At the time it made these representations, TESLA did not have reasonable grounds

22   to believe the TESLA "Autopilot" feature was capable of "full self-driving" (i.e., capable of safely

23   driving autonomously). To the contrary, Tesla knew—from the many publicized fatalities, thousands

24   of customer reports, its own internal testing, and from third-party testing—that the TESLA

25   "Autopilot" feature was not capable of "full self-driving" (i.e., capable of safely driving

26   autonomously).

27       122.    Tesla intended members of the public to rely on its misrepresentations in regarding

28   the TESLA's "Autopilot" feature as capable of "full self-driving" (i.e., capable of safely driving

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    autonomously), and intended members of the public to rely on its "Autopilot" feature to operate

2    their vehicles on public roadways in their stead.

3        123.    Giovanni reasonably relied on those representations when he purchased the Subject

4    Vehicle and used TESLA's "Autopilot" feature to operate his vehicle on public roadways in his stead.

5        124.    As a result of Giovanni's reliance on the Subject Vehicle's "Autopilot" feature to self-

6    drive, Giovanni's TESLA vehicle struck the parked emergency vehicle, causing fatal injuries to

7    Giovanni and serious injuries to Caleb.

8        125.    As a result of that collision, Plaintiffs suffered damages in an amount to be proven at

9    trial.

10                               **Fourth Cause of Action**
                                **Fraudulent Misrepresentation**
11                           (Against Defendant Tesla and Does 1–50)

12       126.    Plaintiffs incorporate herein each and every allegation set forth in the preceding

13    paragraphs as though fully set forth herein.

14       127.    TESLA represented to members of the general public—including —on Twitter, on

15    its blog, in advertising, in promotional materials, and on its website—that the TESLA "Autopilot"

16    feature was capable of "full-self driving" (i.e., capable of safely driving autonomously).

17       128.    This representation was false; the TESLA "Autopilot" feature was not capable of

18    "full self-driving" (i.e., capable of safely driving autonomously). To the contrary, the "Autopilot"

19    feature has only ever been capable of SAE Level 2 automation (i.e., limited driver assistance), even

20    with the so-called "Full Self Driving" upgrade.

21       129.    At the time it made these representations, TESLA knew—from the many publicized

22    fatalities, thousands of customer reports, its own internal testing, and from third-party testing—that

23    the TESLA "Autopilot" feature was not capable of "full self-driving" (i.e., capable of safely driving

24    autonomously). Indeed, TESLA knew that numerous crashes, including fatal crashes, occurred as a

25    result of their customers belief that TESLA's vehicles are autonomous or that Autopilot is an

26    autonomous mode.

27       130.    TESLA intended members of the public—including Giovanni—to rely on its

28    misrepresentations in regarding the TESLA's "Autopilot" feature as capable of "full self-driving"

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1  (i.e., capable of safely driving autonomously), and intended members of the public to rely on its

2  "Autopilot" feature to operate their vehicles on public roadways in their stead.

3      131.      Giovanni reasonably relied on those representations when he purchased a TESLA

4  with the "Autopilot" and "Full Self Driving" upgrades, and when he used TESLA's "Autopilot"

5  feature to operate his vehicle on public roadways in his stead.

6      132.      As a result of Giovanni's reliance on the Subject Vehicle's "Autopilot" feature to self-

7  drive, Giovanni's TESLA vehicle struck the parked emergency vehicle, causing fatal injuries to

8  Giovanni and serious injuries to Caleb.

9      133.      As a result of that collision, Plaintiffs suffered damages in an amount to be proven at

10  trial.

11      134.      TESLA's conscious decision to deceive members of the public regarding the self-

12  driving capabilities of its "Autopilot" feature despite an awareness that customers would rely on the

13  feature for autonomous driving for which it was not designed, and that this had—and would continue

14  to have—dangerous and often deadly consequences purely out of a desire to maximize profits is

15  fraudulent, malicious, and oppressive conduct. Indeed, TESLA knew that disclosing the true

16  capabilities of its ADAS software would conflict with its desire to improve its financial condition and

17  establish itself as a dominant player in the electric vehicle market, and/or would increase costs and

18  thereby reduce its profit margins. That a major auto manufacturer would expose members of the

19  general public to a significantly increased risk of serious injury or death on public roadways simply

20  to maximize profit is loathsome, contemptable, and/or vile conduct that would be looked down

21  upon by most reasonable, ordinary people.

22  **Fifth Cause of Action**<br>**Concealment**<br>(Against Defendant Tesla and Does 1–50)

24      135.      Plaintiffs incorporate herein each and every allegation set forth in the preceding

25  paragraphs as though fully set forth herein.

26      136.      TESLA disclosed to Giovanni—on Twitter, on its blog, in advertising, in

27  Promotional materials, and on its website—that his Tesla Model S was equipped with an "Autopilot"

28  feature that was purportedly "full-self driving."

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

137.    But TESLA did not disclose to Giovanni material information that rendered that disclosure deceptive by conveying the false impression the TESLA "Autopilot" feature was capable of safely driving autonomously. Specifically, TESLA did not disclose that the "Autopilot" feature was only SAE Level 2, that only SAE Level 3 or above can be considered safely fully autonomous, that the Tesla Model S lacked the necessary hardware to ever function beyond Level 2, that TESLA's marketing video purportedly showing "Autopilot" self-driving TESLA was staged, and that there had been thousands of crashes when users allowed the "Autopilot" to self-drive.

138.    Giovanni did not know these facts when he chose to purchase a Tesla Model S with the "Autopilot" feature from the Subject Vehicle's prior owner, or when he chose to rely on those features to drive the Tesla in his stead on public roadways.

139.    TESLA intended to deceive members of the public—including Giovanni—regarding whether TESLA's "Autopilot" feature was capable of "full self-driving" (i.e., capable of safely driving autonomously), by concealing these facts.

140.    Had TESLA told Giovanni that the "Autopilot" feature was only SAE Level 2, that only SAE Level 3 or above can be considered safely fully autonomous, that the Tesla Model S lacked the necessary hardware to ever function beyond Level 2, that TESLA's marketing video purportedly showing "Autopilot" self-driving Tesla was staged, and that there had been thousands of crashes when users allowed the "Autopilot" to self-drive, Giovanni either would not have purchased the Telsa Model S in the first place, and certainly would not have relied on "Autopilot" to operate his Tesla Model S in his stead on a public roadway.

141.    As a result of Giovanni's reliance on the Subject Vehicle's "Autopilot" feature to self-drive, Giovanni's vehicle struck the parked emergency vehicle, causing a major frontal impact and Giovanni's death, and causing Caleb to sustain serious injuries.

142.    As a result of that collision, Plaintiffs suffered damages in an amount to be proven at trial.

143.    TESLA's conscious decision to deceive members of the public regarding the self-driving capabilities of its "Autopilot" feature despite an awareness that customers would rely on the feature for autonomous driving for which it was not designed, and that this had—and would continue

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1    to have—dangerous and often deadly consequences purely out of a desire to maximize profits is

2    fraudulent, malicious, and oppressive conduct. Indeed, TESLA knew that disclosing the true

3    capabilities of its ADAS software would conflict with its desire to improve its financial condition and

4    establish itself as a dominant player in the electric vehicle market, and/or would increase costs and

5    thereby reduce its profit margins. That a major auto manufacturer would expose members of the

6    general public to a significantly increased risk of serious injury or death on public roadways simply

7    to maximize profit is loathsome, contemptable, and/or vile conduct that would be looked down

8    upon by most reasonable, ordinary people.

9                              **Sixth Cause of Action**
                      **Negligent Infliction of Emotional Distress**
10                       (Against Defendant Tesla and Does 1–100)

11       144.    Plaintiffs incorporate herein each and every allegation set forth in the preceding

12   paragraphs as though fully set forth herein.

13       145.    Through the acts and omissions alleged herein, Defendants, and each of them,

14   failed to exercise a reasonable degree of skill and care in their conduct towards Plaintiff. Defendants,

15   and each of them, breached and failed in their obligations and duties and otherwise breached their

16   duty of reasonable care and were negligent.

17       146.    Plaintiff CALEB MENDOZA is the brother of Decedent Giovanni Mendoza and

18   was present when Giovanni sustained fatal injuries in the subject motor vehicle collision and died at

19   the scene of the crash.

20       147.    As a direct and proximate result of the collision and of witnessing the unexpected,

21   untimely, and horrific death of his brother, Plaintiff CALEB MENDOZA experienced severe

22   emotional distress, including but not limited to shock, anguish, horror, anxiety, worry and grief.

23                             **Seventh Cause of Action**
                                  **Wrongful Death**
24                       (Against Defendant Tesla and Does 1-100)

25       148.    Plaintiffs incorporate herein each and every allegation set forth in the preceding

26   paragraphs as though fully set forth herein.

27       149.    As a direct and proximate result of the actions and inactions of Defendants as alleged

28   herein, Eduardo and Maria's son, Genesis Giovanni Mendoza Martinez, died an untimely death at

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1   the scene of the crash on February 18, 2023, at the age of 31 years old, from fatal injuries sustained

2   in the subject motor vehicle collision.

3       150.      Plaintiffs Eduardo and Maria Mendoza have suffered and will suffer damages for the

4   wrongful death of their son, including, but not limited to, loss of society, comfort, companionship,

5   services, and affection, and other general damages.

### Prayer for Relief

7       WHEREFORE Plaintiffs pray for judgment against Defendants as follows:

8       1.      For economic damages according to proof at the time of trial;

9       2.      For noneconomic damages according to proof at the time of trial;

10      3.      For punitive damages against Tesla in an amount to be proven at trial;

11      4.      For costs of suit;

12      5.      For pre-judgement interest in accordance with Civil Code sections 3287, 3288, and

13          3291; and

14      6.      For such other relief as is fair, just, equitable and as the Court may deem proper.

### DEMAND FOR JURY TRIAL

17      Plaintiff demands trial by jury on all issues for which the right to a jury trial is guaranteed by

18  the U.S. Constitution, California Constitution, and/or California law.

19  Dated: September 25, 2024        SINGLETON SCHREIBER, LLP

21          By:

22  Brett Schreiber, Esq.
    Attorneys for Plaintiffs CALEB MENDOZA, EDUARDO
23  AND MARIA MENDOZA, and the ESTATE OF
    GENESIS GIOVANNI MENDOZA MARTINEZ, by
24  and through its personal representatives Eduardo and Maria
    Elena Mendoza

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Brett J. Schreiber, Esq. (SBN 239707)<br>Singleton Schreiber, LLP, 591 Camino de la Reina, Ste. 1025, San Diego, CA 92108<br><br>TELEPHONE NO.: (619) 771-3473    FAX NO.: (619) 255-1515<br>EMAIL ADDRESS: bschreiber@singletonschreiber.com<br>ATTORNEY FOR *(Name):* Caleb Mendoza, et al. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  CONTRA COSTA
 STREET ADDRESS: 725 Court Street
 MAILING ADDRESS: 725 Court Street
 CITY AND ZIP CODE: Martinez, CA 94553
  BRANCH NAME: Wakefield Taylor Courthouse

CASE NAME:
Caleb Mendoza, et al. v. Tesla Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $35,000) | [ ] Limited<br>(Amount<br>demanded is<br>$35,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | C24-02690 |
| | | | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[x] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
 a. [ ] Large number of separately represented parties
 b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
 c. [ ] Substantial amount of documentary evidence
 d. [ ] Large number of witnesses
 e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
 f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* 1. Strict Products Liability; 2. Negligent Products Liability; 3. Negligent Misrepresentation
5. This case [ ] is [x] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 10/09/2024
Brett J. Schreiber, Esq.
_____
(TYPE OR PRINT NAME)          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 (Rev. January 1, 2024)

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET     CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
 Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
 Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*
**Other PI/PD/WD (Personal Injury/
 Property Damage/Wrongful Death) Tort**
 Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
   Wrongful Death
 Product Liability *(not asbestos or
  toxic/environmental)* (24)
 Medical Malpractice (45)
  Medical Malpractice–
   Physicians & Surgeons
  Other Professional Health Care
   Malpractice
 Other PI/PD/WD (23)
  Premises Liability (e.g., slip
   and fall)
  Intentional Bodily Injury/PD/WD
   (e.g., assault, vandalism)
  Intentional Infliction of
   Emotional Distress
  Negligent Infliction of
   Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
 Business Tort/Unfair Business
  Practice (07)
 Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
 Defamation (e.g., slander, libel) (13)
 Fraud (16)
 Intellectual Property (19)
 Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
   *(not medical or legal)*
 Other Non-PI/PD/WD Tort (35)
**Employment**
 Wrongful Termination (36)
 Other Employment (15)

**Contract**
 Breach of Contract/Warranty (06)
  Breach of Rental/Lease
   Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
   Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
   Warranty
  Other Breach of Contract/Warranty
 Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
 Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
 Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
 Eminent Domain/Inverse
  Condemnation (14)
 Wrongful Eviction (33)
 Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
   domain, landlord/tenant, or
   foreclosure)*
**Unlawful Detainer**
 Commercial (31)
 Residential (32)
 Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*
**Judicial Review**
 Asset Forfeiture (05)
 Petition Re: Arbitration Award (11)
 Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
   Case Matter
  Writ–Other Limited Court Case Review
 Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner
   Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
 Antitrust/Trade Regulation (03)
 Construction Defect (10)
 Claims Involving Mass Tort (40)
 Securities Litigation (28)
 Environmental/Toxic Tort (30)
 Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)
**Enforcement of Judgment**
 Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
 Confession of Judgment *(non-domestic
  relations)*
 Sister State Judgment
 Administrative Agency Award
  *(not unpaid taxes)*
 Petition/Certification of Entry of
  Judgment on Unpaid Taxes
 Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
 RICO (27)
 Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
   harassment)*
  Mechanics Lien
  Other Commercial Complaint
   Case *(non-tort/non-complex)*
  Other Civil Complaint
   *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
 Partnership and Corporate
  Governance (21)
 Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CM-110**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY**  STATE BAR NUMBER:<br>NAME:<br>FIRM NAME:<br>STREET ADDRESS:<br>CITY:  STATE:  ZIP CODE:<br>TELEPHONE NO.:  FAX NO.:<br>EMAIL ADDRESS:<br>ATTORNEY FOR *(name)*: | **FOR COURT USE ONLY** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**
 STREET ADDRESS:
 MAILING ADDRESS:
CITY AND ZIP CODE:
 BRANCH NAME:

 PLAINTIFF/PETITIONER:

 DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):*  ☐ **UNLIMITED CASE**  ☐ **LIMITED CASE**<br> (Amount demanded  (Amount demanded is $35,000<br> exceeds $35,000)  or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:  Time:  Dept.:  Div.:  Room:

Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by** *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐  This statement is submitted by party *(name)*:
   b. ☐  This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐  The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐  All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐  The following parties named in the complaint or cross-complaint
      (1) ☐  have not been served *(specify names and explain why not)*:

      (2) ☐  have been served but have not appeared and have not been dismissed *(specify names)*:

      (3) ☐  have had a default entered against them *(specify names)*:

   c. ☐  The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint  *(Describe, including causes of action)*:

**Page 1 of 5**

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b.  Provide a brief statement of the case, including any damages *(if personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings; if equitable relief is sought, describe the nature of the relief)*:

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**

The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial)*:

6. **Trial date**

   a. ☐ The trial has been set for *(date)*:

   b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain)*:

   c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability)*:

7. **Estimated length of trial**

The party or parties estimate that the trial will take *(check one)*

   a. ☐ days *(specify number)*:

   b. ☐ hours (short causes) *(specify)*:

8. **Trial representation** *(to be answered for each party)*

The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:

   a. Attorney:

   b. Firm:

   c. Address:

   d. Telephone number:                    f.  Fax number:

   e. Email address:                         g.  Party represented:

   ☐ Additional representation is described in Attachment 8.

9. **Preference**

   ☐ This case is entitled to preference *(specify code section)*:

10. **Alternative dispute resolution (ADR)**

   a. **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 of the California Rules of Court for information about the processes available through the court and community programs in this case.

   (1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

   (2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

   b. **Referral to judicial arbitration or civil action mediation** (if available).

   (1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

   (2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

   (3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption)*:

**CM-110**

| PLÁINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER: |
| --- | --- |

10. c.  In the table below, indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in (check all that apply and provide the specified information):

|  | The party or parties completing this form in the case **are willing** to participate in the following ADR processes (check all that apply): | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes (attach a copy of the parties' ADR stipulation): |
| --- | --- | --- |
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for (date):<br>☐ Agreed to complete mediation by (date):<br>☐ Mediation completed on (date): |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for (date):<br>☐ Agreed to complete settlement conference by (date):<br>☐ Settlement conference completed on (date): |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for (date):<br>☐ Agreed to complete neutral evaluation by (date):<br>☐ Neutral evaluation completed on (date): |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for (date):<br>☐ Agreed to complete judicial arbitration by (date):<br>☐ Judicial arbitration completed on (date): |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for (date):<br>☐ Agreed to complete private arbitration by (date):<br>☐ Private arbitration completed on (date): |
| (6) Other (specify): | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for (date):<br>☐ Agreed to complete ADR session by (date):<br>☐ ADR completed on (date): |

**CASE MANAGEMENT STATEMENT**

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:

(2) Name of court:

(3) Case number:

(4) Status:

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $35,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. ☐ After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

**CASE MANAGEMENT STATEMENT**

For your protection and privacy, please press the Clear This Form button after you have printed the form. | Print this form | Save this form | Clear this form

Electronically Filed Superior Court of CA County of Contra Costa 10/18/2024 2:23 PM By: A. Stewart, Deputy

Brett J. Schreiber, Esq. (SBN 239707)
J. Domenic Martini, Esq. (SBN 324064)
Singleton Schreiber, LLP
591 Camino de la Reina, Ste. 1025
San Diego, California 92108
Tel: (619) 488-6699 Fax: (619) 488-6699
bschreiber@singletonschreiber.com
dmartini@singletonschreiber.com

Attorneys for Plaintiff Estate of Genesis G. Mendoza-Martinez

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF CONTRA COSTA

| | |
|---|---|
| **Eduardo Mendoza and Maria Elena Mendoza,** as successors in interest to **Decedent Genesis G. Mendoza-Martinez,**<br><br>Plaintiff,<br><br>**Tesla Motors, Inc.,** and Does 1 through 50, inclusive,<br><br>Defendants. | Case No.: C24-02690<br><br>**Declaration of Eduardo Mendoza and Maria Elena Mendoza Per Code Civ. Proc. §377.32** |

We, **Eduardo Mendoza and Maria Elena Mendoza,** declare as follows:

1.    We are the successors in interest to decedent Genesis G. Mendoza-Martinez, our son.

2.    This declaration is based on our personal knowledge.  If called to testify as to these matters, we could and would competently testify to the following.

3.    Pursuant to Code of Civil Proc. §377.32:

a.    Decedent's name: **Genesis G. Mendoza-Martinez.** Decedent died on February 18, 2023, in Contra Costa, California.

b.    No proceeding is now pending in California for administration of the decedent's estate.

c.    The affiants or declarants are the decedent's successors in interest (as defined

1

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

1   in Section 377.11 of the California Code of Civil Procedure) and succeed to the decedent's

2   interest in the action or proceeding.

3         d.      No other person has a superior right to commence the action or proceeding

4   or to be substituted for the decedent in the pending action or proceeding.

5         e.      A true and correct certified copy of the decedent's death certificate is attached

6   to this Declaration as **EXHIBIT A.**

7

8   The affiants or declarants affirm or declare under penalty of perjury under the laws of the State of

9   California that the foregoing is true and correct.

10

11   Dated: M       8, 2023

12

13

14

15   Dated: March 8, 2023

16

17

**Eduardo Mendoza**, executed in Bethel Island, California

**Maria Elena Mendoza**, executed in Bethel Island, California

18

19

20

21

22

23

24

25

26

27

28

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

2

**DECLARATION OF EDUARDO MENDOZA AND MARIA ELENA MENDOZA**

# EXHIBIT A

# STATE OF CALIFORNIA
### CERTIFICATION OF VITAL RECORD

# COUNTY OF CONTRA COSTA
### MARTINEZ, CALIFORNIA

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
VS-11 (REV 2005)

| STATE FILE NUMBER | LOCAL REGISTRATION NUMBER |
|---|---|
| 3052023051211 | 3202307001485 |

**DECEDENT'S PERSONAL DATA**

| 1. NAME OF DECEDENT—FIRST (Given) | 2. MIDDLE | 3. LAST (Family) |
|---|---|---|
| GENESIS | GIOVANNI | MENDOZAMARTINEZ |

AKA, ALSO KNOWN AS – include full AKA (FIRST, MIDDLE, LAST): GENESIS GIOVANN MENDOZA-MARTINEZ

| 4. DATE OF BIRTH mm/dd/ccyy | 5. AGE Yrs | IF UNDER ONE YEAR | IF UNDER 24 HOURS | 6. SEX |
|---|---|---|---|---|
| 06/21/1991 | 31 | Months / Days | Hours / Minutes | M |

| 7. BIRTH STATE/FOREIGN COUNTRY | 8. SOCIAL SECURITY NUMBER | 9. EVER IN U.S. ARMED FORCES? | 10. MARITAL STATUS | 11. DATE OF DEATH mm/dd/ccyy | 112. HOUR 24 Hours |
|---|---|---|---|---|---|
| CA | | YES ☐ NO ☒ UNK ☐ NEVER MARRIED | 02/18/2023 | 0410 |

| 13. EDUCATION – Highest Level/Degree | 14/15. WAS DECEDENT HISPANIC/LATINO/SPANISH? If yes, see worksheet on back) | 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) |
|---|---|---|
| HS GRADUATE | ☒ YES MEXICAN AMERICAN ☐ NO HISPANIC | MEXICAN AMERICAN |

| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) | 19. YEARS IN OCCUPATION |
|---|---|---|
| PERSONAL BANKER | BANKING | 8 |

**USUAL RESIDENCE**

| 20. DECEDENT'S RESIDENCE (Street and number, or location) |
|---|
| 1200 MONTEZUMA STREET |

| 21. CITY | 22. COUNTY/PROVINCE | 23. ZIP CODE | 24. YEARS IN COUNTY | 25. STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| PITTSBURG | CONTRA COSTA | 94565 | 6 | CA |

**INFORMANT**

| 26. INFORMANT'S NAME, RELATIONSHIP | 27. INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state, zip) |
|---|---|
| EDUARDO MENDOZA, FATHER | 1689 TAYLOR ROAD, BETHEL ISLAND, CA 94511 |

**SPOUSE/SRDP AND PARENT INFORMATION**

| 28. NAME OF SURVIVING SPOUSE/SRDP—FIRST | 29. MIDDLE | 30. LAST (BIRTH NAME) |
|---|---|---|
| | | |

| 31. NAME OF FATHER/PARENT—FIRST | 32. MIDDLE | 33. LAST | 34. BIRTH STATE |
|---|---|---|---|
| EDUARDO | | MENDOZA | MEXICO |

| 35. NAME OF MOTHER/PARENT—FIRST | 36. MIDDLE | 37. LAST (BIRTH NAME) | 38. BIRTH STATE |
|---|---|---|---|
| MARIA | E. | MARTINEZ | CA |

**FUNERAL DIRECTOR/LOCAL REGISTRAR**

| 39. DISPOSITION DATE mm/dd/ccyy | 40. PLACE OF FINAL DISPOSITION |
|---|---|
| 03/15/2023 | RESIDENCE OF EDUARDO MENDOZA 1689 TAYLOR ROAD, BETHEL ISLAND, CA 94511 |

| 41. TYPE OF DISPOSITION(S) | 42. SIGNATURE OF EMBALMER | 43. LICENSE NUMBER |
|---|---|---|
| CREMATE/RESIDENCE | ▶ DARRELL SINGLETARY | EMB8533 |

| 44. NAME OF FUNERAL ESTABLISHMENT | 45. LICENSE NUMBER | 46. SIGNATURE OF LOCAL REGISTRAR | 47. DATE mm/dd/ccyy |
|---|---|---|---|
| PITTSBURG FUNERAL CHAPEL | FD510 | ▶ ORI TZVIELI, MD | 03/09/2023 |

**PLACE OF DEATH**

| 101. PLACE OF DEATH | | | | 102. DECEDENT'S | |
|---|---|---|---|---|---|
| PUBLIC ROADWAY | | | | | ☒ Other |

| 103. COUNTY | 104. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) | 105. CITY |
|---|---|---|
| CONTRA COSTA | 37.91614, -122.06511 | WALNUT CREEK |

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH | | Time Interval Between Onset and Death | 108. WAS AUTOPSY... |
|---|---|---|---|
| IMMEDIATE CAUSE (A) BLUNT IMPACT HEAD, THORACO ABDOMINAL AND LEFT LEG INJURIES | | IMMED | ☒ YES ☐ NO |
| Sequentially list conditions, (B) MOTOR VEHICLE COLLISION | | IMMED | 108. BIOPSY PERFORMED? YES ☐ NO ☒ |
| (C) | | | 110. AUTOPSY PERFORMED? YES ☒ NO ☐ |
| (D) | | | 111. USED IN DETERMINING CAUSE? YES ☒ NO ☐ |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| |

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? If yes, list type of operation and date.) | 113A. BIOPSY... |
|---|---|
| UNK | YES ☐ NO ☒ |

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 116. SIGNATURE AND TITLE OF CERTIFIER | 117. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since ___ ▶ | ▶ | | |

**CORONER'S USE ONLY**

| 118. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSE(S) STATED. | | 120. INJURED AT WORK? | 121. INJURY DATE mm/dd/ccyy | 122. HOUR 24 Hours |
|---|---|---|---|---|
| MANNER OF DEATH: Natural ☐ Accident ☒ Homicide ☐ Suicide ☐ Pending Investigation ☐ Could not be Determined ☐ | | YES ☐ NO ☒ UNK ☐ | 02/18/2023 | 0354 |

| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) |
|---|
| OTHER: PUBLIC ROADWAY |

| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) |
|---|
| DRIVER OF MOTOR VEHICLE CRASHED INTO SIDE OF PARKED FIRE TRUCK |

| 125. LOCATION OF INJURY (Street and number, or location, and city and zip) |
|---|
| 37.91614, -122.06511 WALNUT CREEK, CA 94596 |

| 126. SIGNATURE OF CORONER / DEPUTY CORONER | 127. DATE mm/dd/ccyy | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| ▶ CHAD G PRYOR | 03/02/2023 | CHAD G PRYOR, DEP CORONER |

**STATE REGISTRAR**

| A | B | C | D | E | | FAX AUTH.# | CENSUS TRACT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

### CERTIFIED COPY OF VITAL RECORD
STATE OF CALIFORNIA, COUNTY OF CONTRA COSTA

This is a true and exact reproduction of the document officially registered and placed on file in the office of the Contra Costa County Department of Health Services.

DATE ISSUED    03/15/2023    JD





000059787

ORI TZVIELI, MD
HEALTH OFFICER

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the County Health Officer.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

CA CONTRAD1

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF CONTRA COSTA

_____

_____
Plaintiff(s) / Cross Plaintiff(s)

vs.

_____

_____
Defendant(s) / Cross Defendant(s)

### _ADR Case Management Stipulation and Order_
### _(Unlimited Jurisdiction Civil Cases)_

CASE NO: _____

---

► ALL PARTIES STIPULATING TO ADR AND DELAYING THEIR CASE MANAGEMENT CONFERENCE 90 DAYS MUST **SUBMIT THE ORDER FOR THE JUDGE'S SIGNATURE AND FILE THIS FORM AT LEAST 15 DAYS BEFORE THEIR CASE MANAGEMENT CONFERENCE.** (NOT AVAILABLE IN COMPLEX LITIGATION CASES.)

► PARTIES MUST ALSO **SEND A COPY OF THIS <u>FILED</u> STIPULATION AND ORDER TO THE ADR OFFICE**: EMAIL adrweb@contracosta.courts.ca.gov  FAX: (925) 608-2109  MAIL: P.O. BOX 911, MARTINEZ, CA 94553

---

**Counsel and all parties agree to delay their case management conference 90 days to attend ADR and complete pre-ADR discovery as follows:**

1. <u>Selection and scheduling for Alternative Dispute Resolution (ADR)</u>:
   a. The parties have agreed to ADR as follows:
      i. ❑ Mediation  (❑ Court-connected ❑ Private)
      ii. ❑ Arbitration  (❑ Judicial Arbitration (non-binding)  ❑ Private (non-binding)  ❑ Private (binding))
      iii. ❑ Neutral case evaluation
   b. The ADR neutral shall be selected by *(date)*: _____ *(no more than 14 days after filing this form)*
   c. ADR shall be completed by *(date)*: _____ *(no more than 90 days after filing this form)*
2. <u>The parties will complete the following discovery plan</u>:
   a. ❑ Written discovery:   (❑ Additional page(s) attached)
      i. ❑ Interrogatories to:
      ii. ❑ Request for Production of Documents to:
      iii. ❑ Request for Admissions to:
      iv. ❑ Independent Medical Evaluation of:
      v. ❑ Other:
   b. ❑ Deposition of the following parties or witnesses: (❑ Additional page(s) attached)
      i. _____
      ii. _____
      iii. _____
   c. ❑ No Pre-ADR discovery needed
3. The parties also agree: _____
4. Counsel and self-represented parties represent that they are familiar with and will fully comply with all local court rules related to ADR as provided in Title Three; Chapter 5, <u>will pay the fees associated with these services</u>, and understand that if they do not, without good cause, comply with this stipulation and all relevant local court rules, they may be subject to sanctions.

| | | | | |
|---|---|---|---|---|
| Counsel for Plaintiff *(print)* | Fax | | Counsel for Defendant *(print)* | Fax |
| Signature | | | Signature | |
| Counsel for Plaintiff *(print)* | Fax | | Counsel for Defendant *(print)* | Fax |
| Signature | | | Signature | |

---

Pursuant to the Stipulation of the parties, and subject to the *Case Management Order* to be filed, **IT IS SO ORDERED** that the Case Management Conference set for _____ is vacated and rescheduled for _____ at (8:30 a.m. / _____ ) **Plaintiff / Plaintiff's counsel must notify all parties of the new case management conference.**

**Dated:** _____                    _____
                                                         **Judge of the Superior Court**



## CONTRA COSTA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

All judges in the Civil Trial Delay Reduction Program agree that parties should consider using Alternative Dispute Resolution (ADR) to settle their cases. To tell the court you will use ADR:

- Choose ADR on the *Case Management Form (*CM-110);
- File a *Stipulation and Order to Attend ADR and Continue First Case Management Conference 90-Days* (local court form); or
- Agree to ADR at your first court appearance.

*Questions?  Email adrweb@contracosta.courts.ca.gov or call (925) 608-2075*

### MEDIATION
Mediation is often faster and less expensive than going to trial. Mediators help people who have a dispute talk about ways they can settle their case. Parties email, fax or visit the ADR Programs office to get a list of mediators. After parties have agreed on a mediator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the mediator at least 5 court days before mediation starts.

ALL parties and attorneys must go to mediation. Mediation can be held whenever and wherever the parties and the mediator want, as long as they finish before the court deadline. In some kinds of court cases, parties have the chance to mediate in the courthouse on their trial day.

Most mediators begin by talking with the parties together, helping them focus on the important issues. The mediator may also meet with each party alone. Mediators often ask parties for their ideas about how to settle the case. Some mediators tell the parties how much money they think a case is worth, or tell them what they think might happen if the case went to trial. Other mediators help the parties decide these things for themselves. No matter what approach a mediator takes, decisions about settling a case can only be made when all the parties agree.

If the parties go through the court ADR program, mediators do not charge fees for the first half hour spent scheduling or preparing for mediation. They also do not charge fees for the first two hours of mediation. If parties need more time, they must pay the mediators regular fees. Some mediators ask for a deposit before mediation starts. Mediators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the mediation. A party whose court fees have been waived (cancelled) may ask if their mediation fees or deposit can be waived.

If parties agree about how they will settle their case, they can choose to keep it private, write it up as a contract, or ask the judge to make it a court order. What parties say and agree to in mediation is confidential (private).

### PRIVATE MEDIATION
Private mediation works in the same way as judicial mediation, but the parties do not go through the ADR Programs office. Parties choose a mediator on their own, and pay the mediator's normal fees.

**JUDICIAL ARBITRATION** (non-binding)
In judicial arbitration, an independent attorney (arbitrator) looks at the evidence, listens to the parties and their witnesses, and decides how the case will be settled. Judicial arbitration is less formal than court. Parties email, fax or visit the ADR Programs office to get a list of arbitrators. If they cannot agree on an arbitrator, the court will assign one. The judge can send cases to arbitration if there is less than $50,000 in dispute. The person who started the court case can make sure the case goes to arbitration if they agree to limit the amount they are asking for to $50,000. Parties can also agree they want to use judicial arbitration. The arbitrator must send their decision (award) to the court within 10 days of the last hearing. The award becomes a court judgment unless a party asks the court to review the case within 60 days. Parties must use the ADR-102 form to ask for a new court hearing (called a trial de novo.) Judicial arbitrators charge $150 per case or per day.

**PRIVATE ARBITRATION** (non-binding and binding)
Private, non-binding arbitration is the same as judicial arbitration, except that the parties do not go through the ADR Programs office to choose an arbitrator, and the arbitrator's award will not become a judgment of the court unless all parties agree. Parties must pay the arbitrator's normal fees.

Binding arbitration is different from judicial or private non-binding arbitration because the arbitrator's decision is final. Parties give up their right to have a judge review their case later (except for reasons listed in California Code of Civil Procedure, Section 1286.2.) Binding arbitration rules are listed in California Code of Civil Procedure, Sections 1280-1288.8. Parties may also agree any time before the judge has made a decision that ends the case to switch to binding arbitration. Parties choose the arbitrator on their own, and must pay the arbitrator's normal (not $150) fees.

**SETTLEMENT MENTOR CONFERENCE**
Settlement mentors are independent, experienced trial attorneys that a judge has assigned to help parties look for ways to settle their case. The conference is free and is held in the courthouse. It is often held on the morning of trial, but it can be scheduled anytime. These conferences usually last two or three hours. Parties do not present evidence and do not call witnesses. Parties can ask the settlement mentor to keep some information confidential (private) from the other party, but not from the judge. The settlement mentor can share any information with the judge, or involve the judge in settlement discussions.  All principals, clients, and claims representatives must attend the settlement mentor conference.

**NEUTRAL CASE EVALUATION**
In neutral case evaluation, an independent attorney (evaluator) reviews documents and listens to each party's side of the case. The evaluator then tells the parties what they think could happen if the case went to trial. Many people use the evaluator's opinion to reach an agreement on their own, or use this information later in mediation or arbitration to settle their case.

Parties email, fax or visit the ADR Programs office to get a list of evaluators. After parties have agreed on an evaluator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the evaluator at least 5 court days before evaluation starts. ALL parties and their attorneys must go to neutral case evaluation. The evaluation can be held whenever and wherever the parties and the evaluator want, as long as they finish before the court deadline. If the parties go through the court's ADR program, evaluators do not charge any fees for the first half hour spent scheduling or preparing for the evaluation conference. They also do not charge fees for the first two hours of the evaluation. If parties need more time, they must pay that evaluators regular fees. Some evaluators ask for a deposit before evaluation starts. Evaluators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the evaluation. A party whose court fees have been waived (cancelled) may ask if their evaluation fees or deposit can be waived.

## TEMPORARY JUDGE

Some parties want a trial, but want to choose who will decide the case and when the trial will take place. Parties can agree on an attorney that they want the court to appoint as a temporary judge for their case. (See Article 6, Section 21 of the State Constitution and Rule 2.830 of the California Rules of Court.) Temporary judges have nearly the same authority as a superior court judge to conduct a trial and make decisions. As long as the parties meet the court deadline, they can schedule the trial at their own and the temporary judge's convenience.

Each of the temporary judges on the court's panel has agreed to serve at no charge for up to 5 court days. If the parties need more time, they must pay that person's regular fees. All parties and their lawyers must attend the trial, and provide a copy of all briefs or other court documents to the temporary judge at least two weeks before the trial. These trials are similar to other civil trials, but are usually held outside the court. The temporary judge's decision can be appealed to the superior court. There is no option for a jury trial. The parties must provide their own court reporter.

## SPECIAL MASTER

A special master is a private lawyer, retired judge, or other expert appointed by the court to help make day-to-day decisions in a court case. The special master's role can vary, but often includes making decisions that help the discovery (information exchange) process go more smoothly. He or she can make decisions about the facts in the case. Special masters can be especially helpful in complex cases. The trial judge defines what the special master can and cannot do in a court order.

Special masters often issue both interim recommendations and a final report to the parties and the court. If a party objects to what the special master decides or reports to the court, that party can ask the judge to review the matter. In general, the parties choose (by stipulation) whom they want the court to appoint as the special master, but there are times (see California Code of Civil Procedure Section 639), when the court may appoint a special master or referee without the parties' agreement. The parties are responsible to pay the special master's regular fees.

## COMMUNITY MEDIATION SERVICES

Mediation Services are available through non-profit community organizations. These low-cost services are provided by trained volunteer mediators. For more information about these programs contact the ADR Program at adrweb@contracosta.courts.ca.gov